Grant M. COLVIN, et al.,
Plaintiffs–Respondents,

and

George W. Ittner, et al.,
Plaintiffs–Respondents–Cross–Appellants,

v.

Gary T. CARR, et al.,
Defendants–Appellants–Cross–Respondents.

Nos. 56982, 56989.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 2, 1990.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Nov. 7, 1990.

Application to Transfer Denied
Dec. 18, 1990.

Mark Arnold, Shulamith Simon, St. Louis, for defendants-appellants/cross-respondents.

Harold I. Elbert, St. Louis, for plaintiffs-respondents/cross/appellants.

STEPHAN, Judge.

Plaintiffs, the Colvins and several lot owners in Parkview Subdivision, seek construction of a 1905 Trust Indenture which governs the Parkview Subdivision, a residential area in St. Louis City and St. Louis County. The Indenture gave the trustees the right to assess the lots in Parkview, but not in excess of fifty cents per front foot except for certain special assessments. The Indenture established a trust which was to remain in existence until the last original trustee died. After the trust terminated, the 1905 Indenture granted the "rights, powers, and duties" of the trustees to the lot owners in Parkview. The lot owners were to select "agents" as their representatives. The Parkview agents are the named defendants in this lawsuit.

The trust terminated in 1966 when the last original trustee died. By a vote of 188 to 5, the then lot owners adopted an Agree-ment (hereinafter the 1966 Agreement), which imposed an assessment of fifty cents per front foot plus $50 per lot. This assessment was effective for the year 1967, and for each year thereafter, until changed by the affirmative vote of the lot owners.

Between 1967 and 1987, the front foot assessment remained at fifty cents per year. During this period, a majority of the lot owners voted to increase the per lot assessment to $75 in 1969–74; $100 in 1975–76; $155 in 1977–80; and to $225 thereafter.

The Colvins became homeowners in Parkview in September, 1985. The Colvins paid the 1986 and 1987 Parkview assessments, as did the other plaintiffs.

On December 28, 1987, in response to his receipt of a Parkview assessment against him for $286 for 1988, Mr. Colvin wrote a letter to the Parkview agents explaining his belief that the 1905 Indenture did not authorize parts of the assessment. He enclosed two checks with this letter. One was in the amount of $31, which he characterized as the maximum general assessment which could be made under the 1905 Indenture. The second check, for $255, he called a "donation."

The Parkview agents called a meeting of the lot owners in Parkview for February 29, 1988, to vote on an increase in both the per lot assessment and the front foot assessment. On or about February 15, 1988, Mr. Colvin wrote a letter to Parkview residents outlining his belief that the new assessments were unauthorized. Nevertheless, the owners of a majority of the lots voted in favor of the proposed increase in assessments.

On February 29, 1988, Colvin and several other Parkview lot owners sued in the Circuit Court of the City of St. Louis seeking (a) a declaratory judgment stating that the assessments were limited to fifty cents per front foot except for specific projects as provided pursuant to the 1905 Indenture and that the resolution of February 29, 1988, was void; and (b) an injunction restraining the agents from carrying out the terms of the February 29, 1988 resolution.

The case was tried upon a stipulation of the parties. The only live testimony was from Mr. Colvin and his wife.

The trial court found that the 1905 Indenture was plain and unambiguous and further found that assessments made by the 1966 Agreement exceeded those authorized by the 1905 Indenture. The trial court, therefore, ruled that the 1966 Agreement was inapplicable to Colvin and the other plaintiffs who had bought lots in Parkview after 1966. The trial court also, however, estopped plaintiff George Ittner and other plaintiffs who were lot owners in 1966 from denying the validity of the 1966 Agreement. For clarity's sake, we shall identify these pre–1966 lot owners as the Ittner plaintiffs.

The defendants appealed. Both sets of plaintiffs cross-appealed. We issued a show cause order asking the Colvin plaintiffs to explain how they had been aggrieved by the trial court's decision. The Colvin plaintiffs responded, and we ordered that a determination whether the Colvin plaintiffs are aggrieved by the judgment would be determined by the panel at the time of submission.

On appeal, defendants argue (1) that the 1905 Indenture does not restrict the power of a majority of lot owners to make assessments or, in the alternative, (2) that the trial court erred in failing to exercise its inherent authority to require plaintiffs to bear their equitable share of expenses necessary to preserve Parkview. Defendants also argue that the trial court erred in refusing to estop the Colvin plaintiffs from challenging the power of the majority of the lot owners to impose assessments.

Plaintiffs cross-appealed on the ground that the trial court erred in estopping the Ittner plaintiffs from challenging the assessments.

■ Preliminarily, we must decide whether the Colvin plaintiffs are entitled to appeal. Only parties who are aggrieved by a judgment may appeal from it. Section 512.020 RSMo 1986. A party is "aggrieved" when a judgment operates prejudicially and directly on his personal or property rights. *Harris v. Union Electric Co.*, 685 S.W.2d 607, 611 (Mo.App.1985). The trial court found that the Colvin plaintiffs are not required to pay those assessments that are not levied by the 1905 Indenture. Therefore, the judgment has financially helped, rather than hurt, the Colvin plaintiffs.

■ The Colvin plaintiffs argue that, as residential lot owners of Parkview, they have the right to demand that the 1905 Indenture be carried out in all respects in accordance with its terms. They liken their position to a taxpayer challenging the actions of public officials. The Colvin plaintiffs rely on *Berghorn v. Reorganized School Districts No. 8*, 364 Mo. 121, 260 S.W.2d 573 (1953). In that case, the Missouri Supreme Court held that school district taxpayers could sue the school district for illegally collecting and expending public funds in support of parochial, rather than public, schools. *Id.*, 260 S.W.2d at 581. The court reasoned that a taxpayer is an equitable owner of public funds and is hurt when such funds are illegally used, because the taxpayer will be liable to replenish the deficiency. *Id.*

In contrast to this, the Colvin plaintiffs have no such liability regarding the Parkview subdivision. The effect of the trial court's order is that the Colvin plaintiffs will be paying less, not more. Therefore, only the Ittner plaintiffs are aggrieved parties.

■ Defendants first argue that the trial court erred in finding that the 1905 Indenture unambiguously restricts the power of a majority of the lot owners to make assessments. Their argument is not well taken. The 1905 Indenture, although complicated, is unambiguous regarding assessments.

Clause E of the 1905 Indenture gives a long list of rights, powers and duties "to be exercised by them as Trustees for the benefit and advantage of each of the ... lots ..." This list of rights, powers and duties ends on page 8, and the Indenture proceeds to the matter of how Parkview is to pay for all these things. The Indenture provides:

And in order to provide the means necessary to make the payments, perform the duties and avail of and exercise the rights and powers aforesaid, and secure the various ends contemplated and intended to be effected by means of the provisions of this Indenture, the said Trustees are hereby empowered to collect, annually, from the owners of lots embraced in said subdivision, a sum of money sufficient for said purposes; provided, that the total amount required in any one year for said purposes (excepting as hereinafter otherwise expressly provided) shall not exceed a sum equal to fifty cents (50 cents) for each foot of the aggregate frontage of all the lots in said subdivision as hereinafter conclusively assumed or stated.

The total annual amount so required shall be determined or estimated from year to year by said Trustees and the owner or owners of each lot, irrespective of its location, shall be required to pay in advance on such account such proportion of said annual total amount as the frontage of such lot, hereinafter stated or assumed, bears to the total frontage of all the lots in said subdivision as hereinafter stated or assumed.

This section is followed by the express exceptions to the fifty cents per lot limitation. These exceptions include extra assessments for alley and street maintenance, water service, and garbage collection.

The provisions of Clause E were to continue "for and during the lifetime of the last survivor of the three persons named as parties of the second part in this Indenture, but no longer ..."

Clause F begins by continuing in "full force" all the "easement, restrictions, covenants and charges hereinbefore made, declared or imposed." But it continues then "only as easements, restrictions, covenants and charges (and not as trusts)." Clause F also provides that, once there are no longer any trust or Trustees, power is given to the lot owners "to carry out, continue and perpetuate in respect of said subdivision the general objects and intent of ... this In-

denture in manner following." "Manner following" is elaborated on as:

They, or the owners of the majority of said lots, shall ... have and avail of and exercise like rights, power and duties as are hereinbefore granted to or imposed upon the Trustees, including the right and power from time to time to assess and charge and apportion against the lots in said sub-division, and among the owners thereof, a sum sufficient for the same purposes as said Trustees might have made same while their powers and rights aforesaid remained extant, provided, that while discretion as to all the matters in this Clause mentioned are to be vested in the owners of all or of the major part of said lots as aforesaid, the actual doing of such things, including the collecting from the lot owners as aforesaid, shall be done by and through such person or persons as shall be chosen or appointed for that purpose by said owners, in his or their own name or names, but with the description of agent or agents of Parkview.

The provision that the owners of a majority of the lots shall "have and avail of and exercise like powers and duties as are hereinbefore granted to or imposed upon the Trustees" is plain and unambiguous. It means that the fifty cents per foot limitation and the exceptions to it remain unchanged. It should also be noted that the right to amend the Indenture was not reserved or granted to a majority of the lot owners in Parkview.

The trial judge, in his conclusions of law, remarked that the word "like," was used throughout the Indenture. The trial court concluded that "like" meant "identical." We agree. The trial court did not err in declaring that the 1966 Agreement was not authorized by the 1905 Indenture.

■ Defendants next argue that the trial court erred by not exercising its inherent authority to require plaintiffs to bear their equitable share of expenses necessary to preserve Parkview. We agree.

Defendants rely on *Lake Tishomingo Property Owners Association v. Cronin*, 679 S.W.2d 852 (Mo. banc 1984). In *Lake*

*Tishomingo,* the trust indenture imposed an absolute limit of fifty-five cents per front foot, regardless of majority vote. *Id.* at 854. A majority of the lot owners, pursuant to a prior consent decree [1], voted a special assessment of $2.60 per foot to finance dredging essential to preserve the lake and, hence, the desirability of the subdivision. *Id.* Seven persons, owning a total of sixteen lots, refused to pay the assessment on the ground that it exceeded fifty-five cents per foot. *Id.* at 855. In 1978, the Lake Tishomingo Property Owners Association filed suit against the lot owners who had not paid the assessment. *Id.* at 854–855.

The trial court ordered the lot owners to pay the special assessment. *Id.* at 856. We reversed the trial court, and the Missouri Supreme Court ordered the cause transferred. *Id.* at 853.

The Missouri Supreme Court held that the original consent decree was invalid because reformation or amendment of covenants in an indenture is only permissible upon proof of fraud or mistake. *Id.* at 856; *see also Lake Wauwanoka, Inc. v. Spain,* 622 S.W.2d 309, 314 (Mo.App.1981). However, the Missouri Supreme Court went on to hold:

> The evidence regarding the dredging operation reflects that it was both reasonable and necessary for the preservation of the property value of the more than 900 lots in the subdivision. Under the unique circumstances attending this case, our sense of fairness and justice compels us to enforce the clear equitable obligation of appellants to bear their share of the costs necessary for preserving the common property essential for continuation of the subdivision. Thus understood, the voluntary assessment made and honored by the great majority of property owners was enforceable by the trial court under the court's power to

render equity. (citation omitted) *Id.* at 857.

The present case is quite similar to *Lake Tishomingo.* The stated purpose of the 1905 Indenture is to preserve Parkview as a "desirable residential section." To that end, the Indenture grants the trustees broad powers: "to light, police, sprinkle and clean said Avenues, Streets, Alleys, Parks and Walks, and to do whatever else may to said Trustees or their successors seem to be necessary with respect thereto ...."

The parties stipulated that the Parkview lot owners have a long history, dating from 1966, of approving increased assessments. In 1988, the Parkview agents prepared a six year budget of total expenditures (other than for streets and alleys) in excess of $540,000. This budget was not feasible without the 1988 increased assessment. On February 29, 1988, the lot owners approved the assessment by a vote of 147 to 6.

The trial court found, however, that there was no evidence that the increased assessments were necessary for the preservation of Parkview as a desirable subdivision. The trial court was mistaken in this finding. The fifty cent limitation would allow Parkview a total annual income of approximately $7660 [2] for all purposes other than street and alley construction and repair, waters, and garbage collection. Six years of income at the fifty cent rate would produce barely $45,000—less than a tenth of the budgeted amount.

The largest single expense in the six year budget is $336,214.35 for security patrols. Parkview has a commitment to provide security services in the neighborhood. In February of 1988, the Parkview Agents sent a letter to each of the lot owners indicating that, without the proposed assessment, the "[a]gents will be forced to terminate all funding for security operations in order to devote available revenue

---

1. This decree was recorded in Jefferson County in 1972. *Id.* at 856. It purported to change the original indenture so that changes in the subdivision restrictions could be made upon the approval of a majority of the lot owners. *Id.* at 854–856.

2. This number was obtained by adding up the front footage listed in the Indenture and multiplying that sum by fifty cents. Defendants list the number $7,665.63 in their brief.

**158**

to long-neglected maintenance." On February 29, 1988, the lot owners approved the assessment by a large majority.

 Parkview lies immediately west of Skinker, between Millbrook and Delmar. Defendants ask us to take judicial notice of the serious crimes that occur in that area. Defendants cite the case of *State v. Johnson*, 524 S.W.2d 97 (Mo. banc 1975), in which a murderer made his escape through Parkview. *Id.* at 98. We may judicially notice court records when justice so requires. *Grassmuck v. Autorama Auto Equipment & Supply Co.*, 659 S.W.2d 264, 266 (Mo.App.1983). Defendants also ask us to judicially notice a story in the *St. Louis Post Dispatch* dated January 25, 1988. This story reported that a flight attendant had been murdered one block from Parkview. A court may take judicial notice of events that are common knowledge. *Brooks v. Stewart*, 335 S.W.2d 104, 112 (Mo.1960). The murder of the flight attendant was widely publicized and was, in St. Louis, a matter of common knowledge. In addition, we can take judicial notice of the changes, including the increase in crime, that have occurred in the West St. Louis City area since 1905. *See Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 843 (Mo.1963).

Defendants have shown that a large majority of the Parkview residents believe that private security patrols are necessary for the preservation of Parkview, and that the fifty cent limitation is insufficient to pay for these patrols. In *Lake Tishomingo*, it was important that the residents believed the dredging operation was necessary. *See Lake Tishomingo*, 679 S.W.2d at 857. However, in *Lake Tishomingo* there was also objective evidence of the necessity of the dredging operation. *Id.* at 854. In our case, the objective evidence is weaker, but the need for security patrols is not objectively provable. The residents' desire for security patrols is the best evidence of the need for such patrols.

Since the majority of the Parkview lot owners feel an obligation to pay the increased assessments in order to preserve Parkview, it is unfair that the few lot own-

ers who are unwilling to pay the increased assessments should be given a free ride by the paying lot owners. Therefore, we use our inherent equitable authority to compel payment of the increased assessments.

We do not need to address the Ittner plaintiffs' claim that the trial court erroneously estopped them from challenging the assessments, as we hold all lot owners are compelled to pay the assessments.

Judgment is reversed and remanded to the trial court for entry of judgment consistent with this opinion.

HAMILTON, P.J., and CARL R. GAERTNER, J., concur.