**BRAESHIRE CONDOMINIUM BOARD OF MANAGERS,**
Plaintiff–Respondent,

v.

**Donald and Susan BRINKMEYER,**
Defendants–Appellants.

No. 60585.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 15, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Nov. 19, 1992.

Application to Transfer Denied
Dec. 18, 1992.

Thomas E. Allen, Clayton, for defendants-appellants.

Harlan G. Dolgin, Marvin Joseph Nodiff, Thomas Grant Brackman, Clayton, for plaintiff-respondent.

STEPHAN, Judge.

Respondent Braeshire Condominium Board of Managers (the "Board") sued appellants Donald and Susan Brinkmeyer (the "Brinkmeyers") for failure to pay two installments of a roof assessment that the Board had levied on their condominium. The trial court ruled in favor of the Board in the amount of $6114.22. The Brinkmeyers challenge the trial court's judgment, claiming that the Board was not duly elected under the terms of the "Braeshire Condominium Declaration of Condominium Bylaws and Indenture" (the "bylaws") and, therefore, the Board did not have the authority to levy the assessment. The Brinkmeyers also claim that the bylaws required the Board to collect this type of assessment in twelve equal installments, instead of just two. Additionally, the Brinkmeyers challenge the sufficiency of the evidence and the trial court's award of attorney's fees in favor of the Board. We affirm the judgment of the trial court.

Braeshire is a condominium development established in 1979. At the time of its formation, the development contained 114 units, all with flat roofs. The flat roofs developed problems, and a number of them began leaking. In October 1985, the Board decided to replace the leaking roofs with new, pitched roofs. At this time, to avoid imposition of a special assessment, the Board chose to replace individual roofs as repairs became necessary. Owners were notified by the Board that if roofing costs during any year exceeded budgeted funds, a special assessment might be necessary.

One year later, at a special meeting held on October 29, 1986, the Board voted to replace all the remaining flat roofs as part of one major project, instead of doing the roofs piecemeal. After discussing the project with a contractor, the Board deter-

mined that if they engaged the contractor's services by March 1, 1987, they would realize a substantial savings. Accordingly, the Board agreed to levy an assessment in 1987 to collect the necessary funds. Each condominium owner was to pay the assessment in two installments, the first due on February 1, 1987, and the second on June 1, 1987. For the Brinkmeyers' three-bedroom unit, the installments amounted to $911.36 and $911.35, respectively. The Board allowed a ten percent discount if condominium owners paid both installments by the first due date. It, however, imposed a ten percent penalty for late payments.

Following the October 29, 1986 special meeting, the Board, in a letter dated November 8, 1986, notified all Braeshire Condominium owners of the roof assessment. The Brinkmeyers refused to pay the assessed amount. Finally, in March 1989, the Board instituted suit against the Brinkmeyers to recover the assessment, and other amounts not relevant to this appeal. The trial court entered judgment in favor of the Board.

We must sustain the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In determining the sufficiency of the evidence, we will accept as true the evidence and inferences favorable to the trial court's judgment, disregarding all contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). Where no findings of fact have been issued, all controverted facts are treated as if found in accordance with the result reached. *In re Estate of Froman*, 803 S.W.2d 176, 179 (Mo.App. 1991).

The Brinkmeyers first challenge the trial court's judgment in favor of the Board. They contend the assessment for roofs violated Braeshire Condominium's bylaws in two respects: one, the Board was not duly elected in accordance with the bylaws so the Board lacked authority to levy the assessment; two, the collection of the assessment in two installments violated the bylaws' requirement of twelve monthly payments for assessments. We address each contention in order.

The Brinkmeyers state that, under the terms of the bylaws, Board members can only be elected at annual meetings of the unit owners at which a quorum of owners is present in person or by proxy. The Brinkmeyers assert that, because there was no quorum of condominium owners at the March 18, 1986 annual meeting when the new Board members were elected, the Board could take no official action after that date. Thus, the Brinkmeyers conclude that the roof assessment that the Board levied on October 29, 1986, cannot be enforced.

Article Six of the declarations pertains to the board of managers and bylaws. Section 6.1 provides that the property is to be administered by the Board, elected by the unit owners. Section 6.2 concerns the Board, number, term and selection. This section states that the Board shall consist of five unit owners, with members of the first elected Board serving staggered terms and, thereafter, serving three year terms. Section 6.3, captioned "MEETINGS OF UNIT OWNERS", provides for annual as well as special meetings, "called with ten days (10) written notice to all owners." This section also states that "[t]he presence at any meeting, either in person or by proxy, of a majority of the unit owners shall constitute a quorum. Any action may be taken at any meeting at which a quorum is present." With 114 units in the Braeshire Condominiums, 58 owners constitute a quorum. The bylaws make no further mention about procedures for election of the Board or for transacting business at annual or special meetings.

It is undisputed that there was no quorum of owners physically present at the March 18, 1986 annual meeting. Indeed, trial testimony established that there had never been a quorum of condominium owners present at any annual meeting. The Board, therefore, had condominium owners elect new Board members by mail-in ballot after the annual meeting. The Board ac-

cepted mail-in ballots until the number of votes received equalled the number required for a quorum.

The Brinkmeyers vigorously urge that the procedure of after-meeting mail-in ballots is neither authorized by the bylaws nor by Missouri statute. The Brinkmeyers are correct that the bylaws do not explicitly allow this method of collecting votes for the Board's election. However, equally clear is that the bylaws do not explicitly prohibit the procedures utilized in the election of Board members. Although these annual meetings lacked a quorum of owners, the use of mail-in ballots provided the owners the means to participate in the elections. While this election procedure may not reflect what the drafters of the bylaws originally envisioned, the procedure does not offend the spirit of the bylaws. Article Fourteen of the bylaws specifies in part that "[t]he provisions of this Declaration shall be *liberally construed* to effectuate its purposes of creating a uniform plan for the development and operation of a first class Condominium apartment development." (Emphasis ours.) We are satisfied that the method the Board utilized in electing its members sufficiently comports with the bylaws, despite the bylaws' ambiguity in detailing the proper procedure for electing Board members.

Beyond our analysis of the language of the bylaws themselves, our research discloses no Missouri case to further guide us. Helpful, albeit not controlling, is the decision by our sister state of Texas in *Harrison v. Air Park Estates Zoning Committee*, 533 S.W.2d 108 (Tex.Civ.App.1976). In *Harrison*, the plaintiff Zoning Committee sought to enjoin the defendant from building an airplane hangar on his lot within the Air Park Estates subdivision. The plaintiff maintained that a modification of the subdivision covenants prohibited such construction. *Id.* at 110. The defendant countered that the modification was improper because the lot owners had approved the measure by signing a petition, rather than by voting at a formal meeting. *Id.* The court first found that the method of collecting votes was not explicitly provided for in the covenants. *Id.* The court continued:

Although notice of the meeting was given to all owners, an insufficient number to modify the restriction attended. Although [the defendant] attended the meeting, he neither signed the petition nor voiced objection. After this meeting a petition to modify was hand circulated to other lot owners. By this effort the proponents of the modification were successful in securing sufficient votes to change the restriction. We see nothing unfair in obtaining the necessary vote by personal contact with the owners.

*Id.* at 111.

Although *Harrison* involved the application of restrictive covenants and not condominium bylaws, the court's analysis aids our review of the situation before us. The Brinkmeyers knew of the mail-in ballot procedure and made no objection to it prior to the passage of the roof assessment. The requisite number of unit owners voted for their choice of Board members. The Brinkmeyers have not shown that they were in any way prejudiced by the mail-in ballot procedure. We hold that, in light of the bylaws' ambiguity on the mechanics of Board elections, there was no impropriety in the condominium owners' election of the Board by mail-in ballot. Having been duly elected by a quorum of owners, the Board was thus empowered to transact business, including the authority to impose the roof assessment.

■ The Brinkmeyers' second prong is that the bylaws require that the roof assessment be divided into twelve, equal monthly installments, instead of just two. Article Seven of the bylaws pertains to assessments and the maintenance fund. Section 7.2(a) provides for the determination and collection of annual assessments. Under this provision, each year before October 1, the Board must estimate the total amount necessary to operate the Braeshire condominium complex for each year, including repairs, together with an "estimated cash requirement", an amount the Board considers reasonable as a reserve for contingencies and replacements. The Board charges this estimated amount as an as-

sessment against each unit owner in twelve, equal monthly installments beginning in January of the ensuing year.

Section 7.2(b) provides for the imposition of a special assessment. Section 7.2(b) mandates that the Board build up and maintain a reasonable reserve "for contingencies and replacements". This provision also states: "[e]xtraordinary expenditures and replacements not originally included in the annual estimate which may become necessary during the year, shall be charged first against such reserve." If the " 'estimated cash requirement' proves inadequate for any reason", the Board is empowered to make a special assessment. The remainder of this section requires that the Board give unit owners written notice of the amount and reasons for the special assessment. The special assessment becomes effective "commencing with the monthly maintenance payment which is due next following the delivery or mailing of such notice of further assessment." The same section obligates all unit owners "to pay the adjusted monthly amount."

The Board's installment method of collection for the roof assessment appears to be within the scope of the bylaws under the language of section 7.2(b) for special assessments. While it is clear from section 7.2(b) that such an expenditure "shall be charged first against such reserve", this language is ambiguous. It does not state whether the Board was obligated to totally deplete its reserves before levying a special assessment. It is also unclear from the record before us whether the Board utilized any or all of the reserve for the roof expenditure. However, the record does show that, prior to the special assessment, the earlier 1985 roof repair had been drawn from budgeted funds. The trial court apparently believed that the Board's decision to impose the special assessment for the roofs reflected the Board's determination that the estimated cash requirement had proved inadequate to finance the replacement of roofs, a major capital improvement for the condominiums. We accept this inference drawn from the evidence by the trial court as proper.

The Board's requested payment plan provided for two installment payments over a total of seven months from the time the owners received the special assessment notice in November 1986 to June 1987, the due date for the second installment. This payment plan does not go beyond the language of section 7.2(b) that "such further assessment shall become effective commencing with the monthly maintenance payment which is due next following ... such notice of further assessment." Unlike the annual assessment of section 7.2(a), nothing in section 7.2(b) requires that the special assessment be paid in twelve, equal monthly installments. We hold that the Board did not violate the bylaws by utilizing an installment schedule for payment of the special assessment.

■ In addition to the authority of section 7.2(b) of the bylaws, Missouri case law supports the trial court's exercise of its inherent authority requiring the Brinkmeyers bear their equitable share of the roofing expenses because the project was necessary to preserve the Braeshire Condominiums. The Board relies primarily on two cases: *Lake Tishomingo Property Owners Association v. Cronin*, 679 S.W.2d 852 (Mo. banc 1984), and *Colvin v. Carr*, 799 S.W.2d 153 (Mo.App.1990). We find both these cases to be persuasive authority. In *Lake Tishomingo*, Lake Tishomingo subdivision's trust indenture absolutely limited the subdivision to a maintenance assessment of fifty-five cents per front foot. 679 S.W.2d at 855. A majority of the lot owners, however, voted to levy a special assessment of $2.60 per front foot to finance a dredging project necessary to preserve the lake, and with it, the desirability of the subdivision. *Id.* at 854. A number of owners refused to pay, and the Lake Tishomingo Property Owners Association brought suit to enforce the assessment. *Id.* at 854–55.

For procedural reasons not relevant here, the Missouri Supreme Court held that the assessment was invalid as an exercise of power beyond that allowed in the indenture. *Id.* at 855–56. However, the Missouri Supreme Court went on to hold:

The evidence regarding the dredging operation reflects that it was both reasonable and necessary for the preservation of the property value of the more than 900 lots in the subdivision. Under the unique circumstances attending the case, our sense of fairness and justice compels us to enforce the clear equitable obligation of appellants to bear their share of costs necessary for preserving the common property essential for continuation of the subdivision.

*Id.* at 857.

Similarly, in *Colvin v. Carr,* 799 S.W.2d 153, 154 (Mo.App.1990), a subdivision indenture limited assessments to fifty cents per front foot. A large majority of lot owners agreed to increase the assessment gradually, to fifty cents per front foot plus $225 per lot, to pay for security patrols to police the increasingly crime-stricken neighborhood. *Id.* at 154, 157–58. In *Colvin* we held that the terms of the original indenture did not authorize the increased assessment. *Id.* at 156. However, we concluded:

Defendants have shown that a large majority of the [subdivision] residents believe that private security patrols are necessary for the preservation of [the subdivision], and that the fifty cent limitation is insufficient to pay for these patrols.... The residents' desire for security patrols is the best evidence of the need for such patrols.

Since the majority of the [subdivision] lot owners feel an obligation to pay the increased assessments in order to preserve [the subdivision], it is unfair that the few lot owners who are unwilling to pay the increased assessments should be given a free ride by the paying lot owners. Therefore, we use our inherent equitable authority to compel payment of the increased assessments.

*Id.* at 158.

Here, according to the November 1986 letter notifying owners of the assessment, nearly 100% of the owners who attended the October 21, 1986 budget meeting voiced the opinion that a one-time assessment would be preferred, along with completing all roofs within six months. Furthermore, 105 of 114 unit owners had paid either the entire special assessment or its first installment by the February 1, 1987 due date, indicating their tacit approval and sense of obligation to pay the assessment. Therefore, in accordance with the equitable principles espoused in *Lake Tishomingo* and *Colvin,* we hold that the trial court did not err in requiring the Brinkmeyers pay the special assessment. We deny the Brinkmeyers' first point.

■ The Brinkmeyers also claim that the Board failed to present sufficient evidence of the need, reasonableness, or legality of the special assessment. Here, the trial court did not make findings of fact and conclusions of law. The court, however, is presumed to have made findings consistent with the entered decree. *Board of Managers of Peppertree v. Ricketts,* 701 S.W.2d 767, 768 (Mo.App.1985). Therefore, the trial court necessarily found that evidence was sufficient to support the special assessment.

The record reflects that the condominium roofs had been a recurrent concern discussed both at annual meetings and in letters to owners from the condominium management. Mr. Brinkmeyer himself admitted that the Braeshire Condominiums had been plagued with roof problems throughout their existence. Mr. Brinkmeyer also acknowledged that his adjoining neighbor had problems with the roof over his unit leaking. We conclude that substantial evidence supported the trial court's judgment and it was not against the weight of the evidence. We deny the Brinkmeyers' second point.

Finally, the Brinkmeyers claim that the trial court erred in awarding attorney's fees to the Board. The Brinkmeyers agree that the applicable statute, section 448.3–116.7, RSMo 1986, authorizes an award of attorney's fees only to the prevailing party. However, they argue that, because the trial court erred in entering judgment for the Board, the award of attorney's fees was likewise in error. Given our disposition, we find no merit to the Brinkmeyer's third

point. The award of attorney's fees was proper.

We affirm the judgment of the trial court.

PUDLOWSKI, P.J., and CRIST, J., concur.