**Donald C. SCOTT and Linda L. Scott, Respondents,**

v.

**CAR CITY MOTOR CO., INC., Appellant.**

**No. WD 45332.**

Missouri Court of Appeals, Western District.

Dec. 22, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 1992.

Application to Transfer Denied March 23, 1993.

Louis C. Accurso and Thomas Stein, Kansas City, for appellant.

J.C. Hambrick, Jr., Schulz, Bender, Maher & Blair, P.C., Kansas City, for respondents.

Before ULRICH, P.J., and SHANGLER and FENNER, JJ.

SHANGLER, Judge.

The defendant Car City appeals a judgment entered on a jury verdict in favor of the plaintiffs Donald and Linda Scott for $5,000 actual damages and $50,000 punitive damages. The claim was submitted to the jury on the theory that Car City fraudulently represented that the van they sold to the Scotts was new. The proof that the Scotts attempted was that in fact the car was not new, but had been wrecked. The question on appeal, among others, is the sufficiency of the evidence to submit the claim.

The van purchased by the Scotts was manufactured by Chrysler and then shipped to Tram Body & Coach Works [TRAM] to be converted. TRAM then converted the van according to the order placed by Car City, a Chrysler dealership. It was the practice that after a van was converted, George Martin, a driver for Car City, would go to TRAM to pick up the vehicle. He inspected the van before driving it to Car City in St. Joseph. When he

picks up a van from TRAM, Martin testified, he "look[s] them over everywhere for any kind of damage, for scratches, hail damage, or anything that [he] can find wrong." After Martin finishes the inspection, he reinspects the van with a TRAM employee.

When the new vans arrived at Car City, they were inspected for damage by Bill Casper, then Car City vice-president. When he found any damage, he notified Chrysler or sent it back to Chrysler. Thus, as of August 27, 1986, the date the Scott van was received by Car City, two Car City employees and a TRAM employee had inspected all vans converted by TRAM for damage and found none.

On December 18, 1986, the Scotts purchased a new 1986 Dodge TRAM Conversion Van from Car City for $20,350. Before taking possession, Scott who studied mechanical engineering for one year, thoroughly inspected the vehicle. He checked the odometer statement and matched it to the reading on the van, and test drove the van from St. Joseph to Kansas City and return. Once the Scotts took possession of the van, they brought it back to Car City for warranty repairs several times.

Car City adjusted the hood and tightened the front end several times under the warranty. Car City also tightened the bumper five or six times, and the last time, Car City took the bumper completely off to make sure everything was tight. On June 3, 1987, Car City repaired the left and right doors and the rear door because they were leaking water.

On July 16, 1987, the Scotts' vehicle was vandalized. The vandals sprang the left wing vent to gain access to the inside of the van. The vandals stole the AM/FM radio, tore out the dash, scratched the left door, and damaged the whole window frame. The repairs were done by Mace's body shop. The repairs were not done immediately because the parts had to be ordered.

Sometime in August 1987 after the vandalism, Scott noticed that the van had previously been in a wreck. According to Scott, he made this discovery when one of the workers made a comment that prompted Scott to examine the van. "When I looked at the left side, I seen that the fenders were not the same and knew something was wrong, and I suspected that it had been wrecked."

Scott then drove directly to Car City and talked to Keith Terhune and Scott Clark and told them that he had been sold "a wrecked car." Terhune and Scott of Car City told Scott that they would check with Chrysler to learn if it had been wrecked. Scott was to return several days later for Coder, the general manager of Car City, to inspect the van. Scott was late for the appointment and Coder was not there. That is because, as Scott explained, "on the way out" he took the vehicle to Mace's Body Shop for inspection. Mace pointed out the things that were wrong with the van. Mace explained that when he had changed the vent glass on the left door, "the door was hanging real bad." He looked further and noticed damage on the "left front"; that the left front fender had been replaced; the bumper had been re-chromed and was tilted back; and the welding was not a factory weld. Mace noticed also that the left fender had a lacquer paint while Chrysler factory paint is enamel.

Chrysler responded to the request for a computer check of the van purchased by the Scotts. The record at the Chrysler Corporation indicated that "there was no damage when it left the factory," then the van was sent to TRAM, and "[t]here was no damage there." The response also informed them that the records at "Car City Chrysler" show that when the van was received from TRAM there was no damage and that the records of the "Car City Chrysler" body shop show "no repairs of any nature were ever made on this van." The report added that the "body shop foreman states that when he inspected the van he found that the left front fender had been replaced, but the original lining had been used in the replacement." The foreman stated also that paint applied to the fender "is an off shade from the factory paint and, further, that the weld on the fender is not a Chrysler factory weld."

The only damage noted from the inspection of the van was to the left front fender. Chrysler disclaimed responsibility for that damage since all the records checked "through the factory, conversion company [TRAM], and their own company" disclosed no evidence that the vehicle was damaged "in any way" when it was delivered to the Scotts.

Coder, president and general manager of Car City, also testified. It was he who initiated the record check through the Chrysler computer system in response to Scotts' complaint that the van, purchased as new, had been in a wreck. Coder testified that the van had not been damaged while it was in Car City's possession. He examined the vehicle and could not observe "anything out of the ordinary" about the welds. Coder acknowledged that his foreman had told him that the weld on the left fender was not a factory weld.[1] The work to the van under the warranty adjustment of the hood latching, the front bumper, and the leaks on the left side were the "same general areas" that the Scotts complained about as involved in a prior wreck. Coder explained that if there was "anything that was suspicious" to the Car City employees who worked on the van under the warranty corrections, they would have noted it on the repair orders.

Lyle Beckman, a technical advisor with Chrysler, inspected the van on September 16, 1988, and found that the left fender had not been replaced but that the paint on part of the left fender was not Chrysler factory paint. He checked out every complaint made and found that everything else on the van had not been damaged.

It should be noted that Ed Gibson, a friend of the Scotts who had done body repair work, inspected the van for the Scotts in September 1987. He found that the bumper had been rechromed, the left front fender had been replaced, the grill was cracked, and the inner fender was welded to the fender. The weld made was a wire feed weld, distinctively different from the factory spot weld. The findings duplicate in many particulars those noted by Mace the month before when he undertook to repair the damage to the van from vandalism.

Car City asserts that it was error for the trial court to deny its motions for directed verdict and for judgment notwithstanding the verdict because the evidence was not sufficient to submit the claim of fraudulent misrepresentation.

The elements of common law fraud are 1) a representation, 2) its falsity and, 3) materiality, 4) the speaker's knowledge of its falsity or ignorance of the truth, 5) the speaker's intent that the representation be acted on by the hearer in a manner reasonably contemplated, 6) the hearer's ignorance of the falsity of the representation, 7) the hearer's reliance on the truth of the representation, 8) the hearer's right to rely thereon, and 9) injury to the hearer proximately caused by that reliance. *Sofka v. Thal*, 662 S.W.2d 502, 506[2] (Mo. banc 1983). The motions for directed verdict and for judgment notwithstanding the verdict should be granted if one or more of these essential elements of the cause of action were not supported by substantial evidence. *School Dist. v. U.S. Gypsum Co.*, 750 S.W.2d 442, 445[1] (Mo.App.1988). Thus, a failure to establish any one of these essential elements is fatal to recovery. *Dolan v. Rabenberg*, 360 Mo. 858, 231 S.W.2d 150, 154[2, 3] (1950).

In our review of the trial court denial of a directed verdict at the close of the case, we view the evidence most favorably to the verdict and give it the benefit of all favorable inferences which may be reasonably drawn from the evidence. *Black v. Kansas City S. Ry.*, 436 S.W.2d 19, 23[1] (Mo. banc 1968). A judgment notwithstanding the verdict is proper only if upon such a view of the evidence, reasonable minds could not differ as to the verdict. *Wion v. Carl I. Brown & Co.*, 808 S.W.2d 950, 952[1] (Mo.App.1991). The question on this appeal, therefore, is whether the

---

1. In an affidavit to the Attorney General, Coder stated that his bodyshop foreman believed that the weld in the left fender was not a factory weld. The affidavit was in response to a complaint regarding the van that the Scotts had filed with the Attorney General.

Scotts made a submissible case of fraudulent representation after they are given the benefit of all reasonable inferences from the proof.

 In that assessment, fraud is never presumed, but must be proven. Fraud need not be proven by direct evidence, however, but may be established by facts and circumstances. *Bayer v. American Mut. Casualty Co.*, 359 S.W.2d 748, 752[1–4] (Mo.1962). The proof must be of such a positive and definite quality as to convince the judge of the fraud, and if the evidence is as consistent with honesty as with fraud, the transaction will be deemed honest. *Dillard v. Dillard*, 266 S.W.2d 561, 563[1–4] (Mo.1954). Evidence that amounts to no more than suspicion or conjecture of fraud does not suffice to prove fraud. *Herrold v. Hart*, 290 S.W.2d 49, 55[6–8] (Mo.1956).

Car City argues that the Scotts did not meet their burden to prove that "Car City either knew, or should have known, that the car was damaged before it was sold to the Scotts as new." The scienter that the verdict director submitted to the jury for recovery, however, was not that the defendant "knew or should have known," but and very properly that defendant "knew that it was false or defendant did not know whether the representation was true or false." [2] In that formulation of scienter, it is not necessary to show that Car City had actual knowledge of the falsity of the facts represented. It suffices that the Car City made the representations with the consciousness that it was without knowledge as to their truth or falsity, when, in fact, they were false. *Ackmann v. Keeney–Toelle Real Estate Co.*, 401 S.W.2d 483, 489[6, 7] (Mo. banc 1966); *Mobley v. Copeland*, 828 S.W.2d 717, 724, n. 7 (Mo.App. 1992).

The order overruling the motions of Car City for judgment notwithstanding the verdict or, alternatively, for new trial expressly concluded that there was sufficient evidence from which the jury could find that Car City "had actual knowledge that the van had been damaged and repaired at the time [Car City] represented to [the Scotts] that the van was 'new.'" The court observed that, "depending upon which witnesses or combination of witnesses it found credible," the jury could have made "any of the following inferences" from the evidence:

1. Car City received delivery of the van in an undamaged condition, but it was damaged while in Car City's possession, repaired by Car City, and sold as a new van.

2. The van had already been damaged and repaired prior to delivery to Car City. Upon inspection of the van by Car City's employee, Car City discovered the areas which had been damaged and repaired but sold the van as new to the Scotts.

3. The van had been damaged and repaired prior to delivery to Car City. Car City, through its employee, inspected the van and saw where it may have been damaged previously and repaired but, without investigating further, sold the van as new to the Scotts with the consciousness that it was without knowledge as to whether or not the van had in fact been previously damaged and repaired.

 There was, indeed, evidence from which the jury could find that the van was wrecked before it was sold to the Scotts as new on December 18, 1986. There was no evidence, however, probative of the inference that the van was damaged while in the

---

**2.** The verdict director, Instruction No. 7, was an MAI 23.05 [1981 Revision] submission:

Your verdict must be for plaintiffs if you believe:
First, defendant represented to plaintiffs that the motor vehicle was new, intending that plaintiffs rely upon such representation in purchasing the motor vehicle, and
Second, the representation was false, and

Third, defendant knew that it was false or defendant did not know whether the representation was true or false, and
Fourth, the representation was material to the purchase by plaintiffs of the motor vehicle, and
Fifth, plaintiffs relied on the representation in making the purchase, and in so relying plaintiffs were using ordinary care, and
Sixth, as a direct result of such representation the plaintiffs were damaged.

possession of Car City and before it was sold to the Scotts. There were equal inferences that the van was damaged while in the possession of Chrysler, or of TRAM, and before it was delivered to Car City. Thus, the facts and circumstances presented as to Car City are as consistent with good faith as they are with fraud, and so fraud is not proven. *Martin v. Brune,* 631 S.W.2d 77, 81[10, 11] (Mo.App.1982); *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1218[15, 16] (8th Cir.1985).

We agree with Car City, moreover, that there was no evidence that Car City was aware that the van was wrecked when they sold it to the Scotts as new. Nor was there evidence that Car City spoke with awareness that it was without knowledge as to the truth or falsity as to whether the van was wrecked. It runs against the grain of the evidence to postulate, as does the speculation of the trial court, that "the jury could have logically drawn" the inference that the van was already damaged and repaired prior to delivery to Car City, but that Car City nevertheless sold the van as new to the Scotts. There would be no point to such a gratuitous deception since Chrysler was obligated to, and did, take back any vehicle that was damaged when delivered.

The other inferences the court indulged as "logically" inferable by the jury that the van was damaged while in Car City's possession and repaired and sold as new are simply speculations to supply an empty record. The arguments the Scotts make, that "there was evidence that work done by [Car City] on the areas of the van that had been damaged beginning almost immediately after the sale and that the damage was not disclosed to [the Scotts], but was instead listed as warranty work," proves fraud not only reads impermissible inferences, but also begs the question. In response to direct examination as to "any problems with those particular areas of the van after you bought but before you made

the claim that it in fact had been wrecked," Scott, himself, testified that rattles in the bumper, the leaks of water in the door, and slight leaks in the windows, were all "more or less factory adjustments." The hood adjustment and the removal of the bumper "*to make sure that everything was tightened up*" was "warranty" work, Scott replied. The imputation that the designation warranty work was only disguised damage repair work is not found in the evidence, but only in the rhetorical question of counsel: "[D]id they tell you that it was supposedly covered under the warranty or not?" To which, Scott answered simply, "Yes sir, it was warranty."[3]

This argument begs the question because the evidence still leaves without probative basis what the argument implicitly assumes, that the prior damage to the van detected by Mace when the vehicle was repaired after the vandalism proves that the prior damage was incurred while in the possession of Car City and before the van was sold to the Scotts and that Car City. The argument also begs the issue of scienter, whether Car City knew that the van was not new when it was sold to the Scotts, or that Car City was then conscious that it was without knowledge as to the truth of the fact that the van was new. The acknowledgements by the Car City personnel, that the van had been damaged prior to the discovery of that condition after the van was vandalized and that the welds on one side of the front of the vehicle were not factory welds, were not probative of Car City's scienter. Under the full evidence, not only is there an equal inference that the damage and repair were occasioned while either Chrysler or TRAM was in possession of the van, but there is no evidence to sustain the inference indispensable to recovery, that Car City knew that the car was wrecked, and hence was not new, when it was sold to the Scotts.

3. The numerous warranty repair orders were exhibits but were not filed in this appeal. The arguments that undertake to give them character, therefore, are more tendentious than verisimilar. Nor is it a permissible inference from the narrative evidence that the warranty work began "almost immediately after the sale," as one of the premises of the Scotts' argument has it.

The evidence does not allow the inference that the damage to the van was so noticeable that Car City could not but be aware that it had been damaged and repaired, and not new, when it was sold to the Scotts. Scott, himself an over-the-road truck driver and admittedly "not exactly an amateur about automobiles," thoroughly inspected the van when he purchased it, and saw none of the damage that he claimed at the trial. He test drove it several times from St. Joseph to Kansas City and return and detected no damage or cause to believe the van was damaged. Car City employees examined the van for damage at TRAM, then reexamined the van in the company of a TRAM employee, and no damage was found. When the van arrived at Car City, the vehicle was again inspected and again the van was found intact as new. In addition, Car City had no body shop at the time the van was sold to the Scotts, and so could have made no repairs themselves. The damage was finally discovered only because Mace could not hang the left front door the way that he wanted to, and then he investigated the condition of the vehicle in detail. The testimony of Ed Gibson, church friend of the Scotts, that the bumper had been rechromed and that the weld of the inner fender was different from the factory weld, rests on an inspection of the van after the repairs by Mace from the vandalism and after he had already declared that "diagnosis." It does not yield the inference that the damage that disclosed the prior wreck was palpable by usual observation.

The argument the Scotts make simply chooses to attribute the venality and fraud to Car City and not to Chrysler[4] or to TRAM. But fraud is not presumed, even from such imputations. *Chambers v.*

*McNair*, 692 S.W.2d 320, 323 (Mo.App. 1985). However difficult the proof, fraud must still be proven. *Schnuck v. Kriegshauser*, 371 S.W.2d 242, 248[4–7] (Mo. 1963). Where facts comport as well with honesty as with fraud, the transaction will be deemed an honest one. *Radford v. Radford*, 388 S.W.2d 33, 38 (Mo.1965).

It was error for the trial court to have submitted the fraud cause of action to the jury and to have denied the post trial motion for judgment notwithstanding the verdict. The judgment is reversed.

All concur.

---

**4.** Chrysler was an original party defendant in the suit. The petition alleged the same misrepresentation against Chrysler as it did against Car City. The Scotts settled their claim against Chrysler for $2000 and dismissed Chrysler from the suit. The claim of the petition that Chrysler, through its agents, misrepresented the condition of the vehicle as new when it had been damaged and repaired, is of the kind and during the time that Chrysler practiced as "industry custom" as

to "personnel use vehicles." *See Maugh v. Chrysler Corp.,* 818 S.W.2d 658, especially at 665[10] (Mo.App.1991). We take judicial notice of the facts of that opinion both as a matter of public record and as a matter of common knowledge of the public events the opinion reports. Mo. Const. art. 5, § 12 (1945); *Colvin v. Carr,* 799 S.W.2d 153, 158[5–8] (Mo.App.1990); *In re Estate of Danforth,* 705 S.W.2d 609, 610[1–5] (Mo.App.1986).