Douglas W. Hartig, Office of the Public Defender, Clayton, Judith Larose, Public Defender, Columbia, for appellant.

John Munson Morris III, Breck K. Burgess, Office of the Atty. Gen., Jefferson City, for respondent.

**In re the MARRIAGE OF Donald Lee PFEIFER and Sandra Sue Pfeifer.**

**Donald Lee PFEIFER, Respondent,**

v.

**Sandra Sue PFEIFER, Appellant.**

**No. 18570.**

Missouri Court of Appeals, Southern District, Division Two.

Oct. 1, 1993.

Joseph B. Phillips, Stockton, for appellant.

J.D. Baker, Baker & Dull, Osceola, for respondent.

CROW, Judge.

On September 10, 1991, Donald Lee Pfeifer filed a petition to dissolve his marriage to Sandra Sue Pfeifer, whom he had wed No-

vember 3, 1962. Donald [1] and Sandra signed a separation agreement January 15, 1992. Later that day, Donald appeared in the trial court with his lawyer. Sandra did not appear—she had filed nothing in response to Donald's petition. The trial court heard testimony by Donald and entered a decree dissolving the marriage. The decree approved the separation agreement, incorporated it into the decree, and ordered the parties to perform its provisions.

Nine months later, on October 14, 1992, Donald filed a motion praying the trial court to hold Sandra in contempt because she refused to execute a quitclaim deed to him for the marital real estate he was to receive pursuant to the separation agreement and decree.

Sandra countered with a motion to set aside the separation agreement and decree per Rule 74.06(b). [2]

On November 30, 1992, the trial court heard evidence on Sandra's motion. At the conclusion of the hearing, the trial court entered an order denying the motion. The order reads, in pertinent part:

> The Court finds that [Sandra] has failed to meet her burden of proof to set aside the property settlement agreement and judgment entered herein on January 15, 1992.
>
> Further, the Court finds that there is no just cause for delay and designates this Order as a final and appealable Order. [3]

Sandra appeals. Her sole point relied on is:

> The court erred in failing to set aside the property settlement and judgment entered thereon ... as [Sandra] met her burden of proof of showing she signed the property settlement because of the misconduct and fraud, both extrinsic and intrinsic of [Donald], as follows: (1) he concealed and kept from [Sandra] the total financial situation of the parties (2) he made promises to [Sandra] that he would take care of her, and (3) he threatened her with bankruptcy, the loss of the family farm, and the

ruination of her sons, if she contested the dissolution.

The point presents three numbered allegations of fact. We address them in the order presented.

■ As to allegation "(1)," Sandra points out the separation agreement did not provide for division of all marital property, specifically: (a) cattle, (b) bank accounts, and (c) a pending lawsuit by Donald against a real estate broker. Additionally, says Sandra, the agreement did not contain a provision whereby she affirmatively waived maintenance.

Before addressing allegation "(1)," we consider whether the failure of the separation agreement, and consequently the decree, to dispose of items "(a)," "(b)" and "(c)" in the preceding paragraph affects the decree's finality. That question is answered by *State ex rel. McClintock v. Black*, 608 S.W.2d 405 (Mo. banc 1980). There, some seven months after entry of a decree of dissolution, the ex-wife filed a motion to vacate it, contending certain marital property had not been distributed by the decree, hence it was not final. The Supreme Court of Missouri held:

> [O]nce the time for appeal has run, the order of the trial court, although it has failed to divide all of the marital property, is *res judicata* and *final* as to the property with which it has dealt....
>
> [W]e suggest that [the ex-wife] file in the trial court a separate proceeding seeking equitable relief....

*Id.* at 406–07.

In the instant case, the trial court stated at the November 30, 1992, hearing that Sandra may proceed in equity to obtain a division of the marital property omitted by the separation agreement and decree. Applying *McClintock*, we hold the dissolution decree is final, thus we must decide whether the trial court, for the reasons assigned by Sandra, erred in refusing to set it aside.

---

1. For convenience and clarity, we refer to the parties by their respective first names.

2. Rule references are to Missouri Rules of Civil Procedure (1992).

3. The trial court was obviously mindful of Rule 74.01(b).

■ As observed in *Lin v. Lin*, 834 S.W.2d 224, 227 (Mo.App.S.D.1992), our review of this judge-tried case is governed by Rule 73.01(c) as construed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The trial court's order will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1].

■ At the November 30, 1992, hearing, Sandra was shown Respondent's Exhibit 5, a one-page document dated January 11, 1992. She identified it as a "paper" Donald gave her (inferably on January 11, 1992) showing the parties' assets and debts. Exhibit 5 shows debts totaling $424,882 and assets totaling $371,650. Among the assets are 259 head of cattle. Sandra does not contend the parties owned any cattle other than those. This evidence is sufficient to support a finding that Donald did not conceal any cattle from Sandra or misrepresent anything to her about the cattle.

Regarding bank accounts, we gather from the evidence that there were four. Three were at Sac River Valley Bank; one was at Tri–County State Bank. It is inferable from Sandra's testimony that she knew about all four before she signed the separation agreement.

One of the accounts at Sac River Valley Bank was in the names of Donald and Sandra. Sandra admitted in the trial court that she had access to that account. Another account at that bank was in the name "Pfeifer Farms." The third account at that bank, as best we can determine from the transcript,[4] was in the name "Sandy's Restaurant." Sandra testified she had no knowledge of what was in the latter two accounts; however, there was no evidence that Donald misrepresented anything to her about either account or blocked her from obtaining information about them.

Donald testified Sandra was authorized to write checks on the Sandy's Restaurant account and the Pfeifer Farms account. Although Donald's testimony is imprecise, we understand the Pfeifer Farms account was a corporate account. Donald and Sandra owned a one-third interest in the corporation; the remaining interests were owned by two of their adult sons.

The account at Tri–County State Bank was in Donald's name alone. He opened it April 12, 1990. Donald testified he had begun selling real estate and was depositing his earnings in that account. He explained he had a "$115,000 land debt that was due in a year" on the parties' farm (their only real estate), and was trying to set aside money to pay the debt and save the farm. According to Donald, "[T]he only way I could save some money was to keep Sandy from writing checks." Donald identified bank statements which, he said, showed insufficient funds check charges for his and Sandra's account at Sac River Valley Bank for the months of May, June, and July, 1991. Donald recounted, "[S]he was spending tons of money, and … I couldn't keep up."

Sandra was told by Tri–County State Bank that information about Donald's account could be released to her if she obtained authorization from him. She did not ask him for it.

Donald testified that during the separation, Sandra asked him what was in the Tri–County account and he told her.

The evidence in the six paragraphs immediately preceding this one is sufficient to support a finding that Donald did not conceal the parties' "total financial situation" from Sandra and did not misrepresent anything to her about the bank accounts.

As to Donald's pending suit against the broker (the third item unmentioned in the separation agreement), Donald testified Sandra knew about it at the time of the dissolution. Sandra does not cite any evidence to the contrary. The record amply supports a finding that Donald did not conceal his suit against the broker from Sandra or misrepresent anything to her about it.

■ Regarding allegation "(2)" in Sandra's point relied on—the averment that Donald promised to take care of her—we point out

4. Bank records were received in evidence in the trial court, but have not been filed with us.

that an unkept promise does not constitute actionable fraud. *Sofka v. Thal*, 662 S.W.2d 502, 507[5] (Mo. banc 1983). However, a promise accompanied by a present intent not to perform it is a misrepresentation of present state of mind, itself an existing fact, and is sufficient to constitute actionable fraud. *Id.*

■ Sandra testified that after Donald commenced the dissolution proceeding, he told her he would help her along and give her some money if she "would just leave it be so that him and the kids wouldn't lose the farm." At the foot of Exhibit 5, mentioned earlier (the paper Donald gave Sandra showing the parties' assets and debts), appears this: "I will help you out after the divorce the best I can." On one of the pages of the separation agreement, Donald wrote, "I'll always love you and take care of you."

In the separation agreement, Donald assumed all of the parties' debts and agreed to hold Sandra harmless from them. Debts totaling $475,200 are itemized in the agreement.

The agreement awarded the farm to Donald. There was evidence it had been appraised twice, once at $250,000 and once at $214,500. The agreement awarded Donald farm equipment, tools, furniture, household goods, and a 1985 Buick. The agreement awarded Sandra furniture, household goods and a 1986 Oldsmobile. The values of these items are not shown.

Donald testified he agreed to assume all the debts because Sandra could not pay them and he believed this was the best way to save the farm. Donald asserted, "I don't want to take out bankruptcy."

There is ample evidence to support a finding that Donald assumed debts totaling far more than the value of the assets he received. Sandra does not argue otherwise.

Sandra, as we understand her argument, maintains Donald's promises constituted extrinsic fraud which induced her to sign the separation agreement. We disagree. The evidence does not compel a finding that when Donald promised Sandra he would give her money and take care of her after the dissolution, he did not intend to do so. Indeed, he

has paid the child support to which he agreed. Furthermore, Sandra testified she "probably would have" signed the separation agreement even if Donald had made no promises. It is also noteworthy that Sandra consulted a lawyer after she received the summons and dissolution petition, but did not retain the lawyer.

■ This brings us to allegation "(3)" of Sandra's point relied on, the averment that Donald threatened her with bankruptcy, loss of the family farm, and ruination of their sons if she contested the dissolution. In support of this contention, Sandra cites her testimony that Donald told her she was "ruining the boys," and she should accept the agreement "so that him and the kids wouldn't lose the farm." Sandra testified, "[Donald] said that we . . . owed more than it was worth; and if we fight anything, he would have to take bankruptcy anyway."

■ The trial court was not obliged to believe that testimony. In a judge-tried case, the judge is free to believe or disbelieve all, part, or none of the testimony of any witness. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654[1] (Mo. banc 1989).

Sandra does not direct us to any testimony by Donald admitting these "threats." The parties' circumstances immediately before the dissolution are perhaps most accurately reflected in Exhibit 5, mentioned earlier, which shows debts exceeding assets by over $53,000. One passage in Exhibit 5 reads:

If we sold everything, we would owe a 6% comm. on the farm and 15% comm. On the cattle and equipment, that would show more loss[.] We can take out bankruptcy on the land, cattle and machinery debt. but can't take it out on our taxes, we would owe approx. $20,000 each until paid, would be hard to do. So I'm going to assume all liabilities and keep the farm. . . . I'm paying $93.92 int. daily just stay on the farm. . . . I'm assuming this debt because of the boys, and the Pfeifer name. . . .

■ Sandra's point relied on concedes she had the burden of proving she signed the separation agreement because of misconduct and fraud by Donald. Her claim of error is essentially that her evidence was more per-

suasive than his. That contention does not aid her on appeal, as we do not substitute our judgment for that of the trial court on credibility issues. *Zweemer v. Cantrell,* 823 S.W.2d 531, 533–34[4] (Mo.App.S.D.1992); *Stratton v. Stratton,* 694 S.W.2d 510, 512[2] (Mo.App.E.D.1985).

At the conclusion of the evidence on November 30, 1992, the trial court said: "I don't see that Mrs. Pfeifer has met the standard to throw out the separation agreement. I think what is before the Court honestly appears reasonable to the extent that, when the case first came to me, and still looking at it today, I think, for all practical purposes, the parties are bankrupt. They have more debts than they have assets."

If Donald did tell Sandra they were facing bankruptcy, such a statement could reasonably be viewed as nothing more than an assessment of their financial plight, not a "threat." Accepting as true, as we must, the evidence and inferences from it favorable to the trial court's order, *T.B.G.,* 772 S.W.2d at 654[2], we hold the trial court did not err in any respect assigned by Sandra.

The order appealed from is affirmed.[5]

PREWITT and GARRISON, JJ., concur.

5. In oral argument in this Court, Sandra's lawyer indicated that even if this appeal were unsuccessful, Sandra intends to seek maintenance in the trial court. We need not, and do not, express any opinion on whether the separation agreement and dissolution decree bar such a claim.