**THOROUGHBRED FORD, INC., Robert S. Porter, Roger W. Porter and Brenda K. Porter, Plaintiffs/Appellants,**

v.

**FORD MOTOR COMPANY and Ford Leasing Development Company, Defendants/Respondents.**

No. 66196.

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 15, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 25, 1995.

Application to Transfer Denied Nov. 21, 1995.

---

James C. Brandenburg, Brandenburg & Lownsdale, Clayton, for appellants.

Godfrey P. Padberg, Padberg, McSweeney, Slater, Merz & Graham, St. Louis, George E. Feldmiller, Stinson, Mag & Fizzell, P.C., Kansas City, for respondents.

SIMON, Judge.

Plaintiffs, Thoroughbred Ford (Thoroughbred), Robert Porter (Porter), Roger Porter (Roger) and Brenda Porter, appeal from the trial court's judgment granting judgment notwithstanding the verdict in favor of defendant Ford Motor Company (Ford) on plaintiffs' claim that Ford prevented them from selling the Thoroughbred motor vehicle franchise in violation of the Motor Vehicle Franchise Practices Act (MVFPA), §§ 407.810–.835 RSMo.1994. Plaintiffs also appeal from the trial court's grant of directed verdicts in favor of defendants, Ford and Ford Leasing Development Company (Ford Leasing), on plaintiffs' remaining claims alleging that Ford committed fraudulent misrepresentation and fraudulent concealment and breached the covenant of good faith and fair dealing implied in a franchise contract between the parties and that Ford Leasing violated the MVFPA and breached the covenant of good faith and fair dealing implied in a lease between the parties. Moreover, plaintiffs contend the trial court erred in making a num-

ber of rulings excluding various items from evidence. We affirm.

Viewed in the light most favorable to plaintiffs, the facts are as follows. In late 1984, Porter became interested in purchasing Schneider Ford, a Ford dealership located northeast of downtown Kansas City at the intersection of Independence and Paseo, an area that was declining economically. At trial, Porter testified that in May 1984, prior to his purchase of the dealership, he became concerned that the dealership was a "delete point," a Ford designation assigned to a dealership based upon market studies meaning that such a dealership will be "eliminated at the time of dealer change." Porter testified that he contacted by telephone Joseph Heisler, district sales manager for the Kansas City area Ford district, and Heisler assured Porter that the dealership was a "move point," not a "delete point." Porter contends Heisler additionally stated that Ford planned to move the dealership to the intersection of Interstate 29 and Barry Road, an area north of Kansas City near the airport. Heisler thought it would be an excellent location for a Ford dealership because of the area's strong economic growth potential. Porter testified that he was induced into buying the dealership by Heisler's representation that Ford planned to move the dealership to I–29/Barry Road.

Porter bought the Schneider Ford dealership and renamed it Thoroughbred Ford. The record does not indicate the date of this transaction. On July 5, 1984, Ford and Porter, acting as president of Thoroughbred, executed a Ford Sales and Service Agreement (FSSA), establishing Thoroughbred as an authorized Ford dealership and outlining Ford's responsibilities in producing and selling products to Thoroughbred and the dealership's duties in reselling the products and providing services for them. The parties also executed a Dealership Facilities Supplement, an addendum to the FSSA, which identified the intersection of Independence and Paseo as the authorized location for Thoroughbred's operation. The FSSA provided that Porter could not change the location of his dealership without the prior consent of Ford and the execution of a new Dealership Facilities Supplement. The FSSA further provided that Ford retained the right to determine, from time to time, in its best judgment, the numbers, location and sizes of authorized dealers necessary for satisfactory sales and service for its products in Thoroughbred's locality based on market studies.

On July 13, 1984, Porter opened the Thoroughbred dealership for business. Also on this day, Porter and Ford Leasing executed a 10–year lease agreement for the dealership facilities. Porter testified that he knew the facility was 20 years old but he did not ask Ford Leasing about the condition of any aspect of the facilities. The lease provided that the monthly rent was $5,124.00, that Porter was fully aware of the physical condition of the facilities and that he accepted the premises "as is."

Approximately every three or four years, an expert for Ford analyzes a multiple-dealership market such as the Kansas City metropolitan area, studying the economic condition of the market and the sales and service performance of each dealership and recommending what, if any, changes need to be made to the dealerships. When Porter became a Ford dealer, his location, based on the most recent market study of the Kansas City district, was a "monitored area of decline," a designation given to a dealership located in an area with declining business conditions. Ford may in its discretion eliminate a dealership under this designation. At trial, Porter testified that Ford did not tell him of this designation when he purchased Thoroughbred. Had he known of the designation, Porter contends, he would not have purchased the dealership. Heisler testified in a deposition that it was customary, and he thought necessary, for Ford to advise a prospective dealer of the economic conditions of the entire market and the specific location sought by the candidate.

In 1984, Ford conducted a study of the Kansas City metropolitan area market. The results of the survey, which indicated that Thoroughbred was located in a "monitored area of decline," were released in the fall of 1984. Porter was aware of the results of the study but testified that no one at Ford ex-

plained to him what the designation "monitored area" meant.

In March 1985, Porter's brother, Roger, became a partial owner and vice president of Thoroughbred. Roger testified that prior to investing $100,000.00 in Thoroughbred he had qualms about the viability of the dealership because it was located in an old area with no economic growth and increasing crime. Roger testified, however, that his brother persuaded him to invest in Thoroughbred by assuring him that Heisler said the dealership was a "move point" and could be relocated to a better site.

From July 1984 to July 1988, Thoroughbred completely remodeled the dealership facilities. The improvements, which included tuck-pointing, sandblasting and repainting and the installation of a new roof, track lighting, a new sound system and a paint booth with a mezzanine, were necessary according to Porter in order to maintain a clean facility which would attract customers. Thoroughbred asked Ford Leasing to cover the costs for some of the improvements with the understanding that its monthly lease payment would increase accordingly. By July 1988, Thoroughbred's monthly lease payment had increased to $8,126.00. Thoroughbred additionally spent approximately $75,000.00 of its own money to pay for some of the improvements.

From July 1984 to late 1987, Porter never had any discussions with Ford about relocating Thoroughbred nor did he investigate or price any specific property for such a relocation. During this time, Chuck Meyer replaced Heisler as the district sales manager for the Kansas City Ford district, and Armin Allen became the assistant district sales manager for the same district. Porter testified that he never informed Meyer that Heisler had given him an oral commitment to relocate Thoroughbred to I–29/Barry Road.

In 1987, Ford conducted another market study of the Kansas City area. On August 18, 1987, the study results were released at a meeting for all Kansas City area Ford dealers, which Porter and Roger attended. In a letter from Meyer to Porter dated October 22, 1987, Meyer reaffirmed the results of the study which designated the I–29/Barry Road

area as a "future preferred location" and noted that the area "will require Ford representation in the future, but no action is planned at this time." Porter testified that he and his brother spoke with Meyer and Allen who told them that I–29/Barry Road was the preferred future site for Thoroughbred, that they should begin looking at property in that area and that they should write a letter to Ford "to get real estate people down here and start doing a site search." Roger testified that Meyer and Allen promised him and Porter that they could relocate to I–29/Barry Road if they sold a lot of vehicles.

In the summer of 1988, the Porters began discussing with Bob Sherwood and Ted Ehney, real estate developers for Executive Hills North, their interest in purchasing property located in the I–29/Barry Road area. In early September 1988, Meyer met with the Porters, Sherwood and Ehney and looked at an overview of a parcel of property for sale in the I–29/Barry Road area. Porter testified that he interpreted Meyer's comments after the meeting to mean that Meyer liked the site and felt it was an excellent location for a Ford dealership. Meyer told Porter to write him a letter indicating Thoroughbred's interest in acquiring this land and listing the parties who would have to be involved in the project. On September 14, 1988, Porter sent Meyer a letter stating that he had a commitment with the owners of 10 acres of land in the I–29/Barry Road area, that the area was growing rapidly, that the economic conditions near Thoroughbred were declining quickly, that he would like to relocate Thoroughbred as soon as possible and that the project required the participation of Ford, Ford Dealership Real Estate Sales Operation (Ford Real Estate) and Executive Hills.

On October 7, 1988, Ford Real Estate sent the Porters a letter stating that it had assigned Loren McMurray to assist them in finding a relocation site for their dealership. McMurray traveled to Kansas City, met with the Porters and representatives of Executive Hills and viewed the property which the Porters and Meyer had previously investigated. McMurray told the Porters he liked the site. Ford then prepared a project estimate

sheet for the Porters in which it estimated the rent factor for a new dealership facility at the proposed site and set the expected planning volume for such a dealership at 1500 new vehicles per year. Porter testified that by late fall 1988 Thoroughbred was ready and willing to relocate to I–29/Barry Road.

The Porters, however, never purchased any land as a relocation site for Thoroughbred. In the late fall of 1988, Allen contacted Porter and told him that another Kansas City Ford dealer located near Thoroughbred had complained regarding Thoroughbred's potential relocation to I–29/Barry Road. He told Porter that he had to stop telling people that Thoroughbred was relocating to I–29/Barry Road. Also, in late 1988 Bill Schaefer replaced Meyer as Ford's district sales manager for the Kansas City district. Porter testified that he never informed Schaefer that Heisler had given him an oral commitment to relocate Thoroughbred to I–29/Barry Road.

In 1989, Ford again conducted a market study of the Kansas City district. The study was completed in 1990, and the results were released to the Kansas City Ford dealers, including Porter and his brother, at a meeting on June 21, 1990. The study revealed that the Kansas City area economy declined in 1989 and was projected to continue declining in 1990. Based on these findings, Ford indicated that it was going to delete one dealership in the area, and it downgraded the I–29/Barry Road site from a "future preferred area" to a "monitored growth area," preventing any relocation of a Ford dealership to that site until the economic conditions in that area improved.

On June 29, 1990, Schaefer sent the Porters a letter stating that Thoroughbred was the designated delete point, meaning that Ford planned to eliminate the Thoroughbred dealership at the time of dealer change. The market report showed that Thoroughbred was located in the worst economic area of all the Kansas City area Ford dealerships— competitive dealerships near Thoroughbred had gone out of business and the area had no projected long-term growth. Thus, Ford no longer wanted to maintain long-term repre-

sentation at that location. In his letter, however, Schaefer assured the Porters that they could continue to operate Thoroughbred as long as they desired to do so.

Schaefer then came to Thoroughbred to discuss the delete letter with the Porters. Schaefer reiterated that the market study determined that Thoroughbred was no longer a viable Ford dealership location and that the I–29/Barry Road site could not support a dealership. Schaefer again reassured the Porters that they could continue to operate Thoroughbred for as long as they desired. Both Porters testified that Schaefer told them they could not relocate or sell their dealership.

The Porters then contacted Peter Lehr at Ford Leasing and proposed that they purchase the dealership facility in order to cut their rental cost. Lehr initially approved the proposal and sent the Porters a pamphlet regarding Ford Leasing's policies on purchasing dealership facilities. The following statement appeared in the pamphlet under the heading "Eligible Facilities":

> Dealership facilities owned and designated as **for sale** by Ford Leasing are eligible for purchase pursuant to the Plan [set forth in the pamphlet] under certain conditions. A Dealership facility designated as **for sale** may be redesignated as **NOT for sale** by Ford Leasing at any time, without notice to the dealer or other parties.

On August 27, 1990, Lehr wrote the Porters, informing them that Ford Leasing had redesignated the Thoroughbred facility as "not for sale." On September 11, 1990, Schaefer wrote Porter, revealing that Ford had made the decision to not permit the Porters to purchase the Thoroughbred facility based upon its long-term plan under the 1989 market study to eliminate the Thoroughbred dealership. Schaefer then encouraged Porter to "improve upon your sales, profit, and QC–P [customer satisfaction] performance as these factors impact your ultimate future as a Ford dealer."

Porter testified that Schaefer subsequently told him that Ford would not permit Thoroughbred to buy the dealership facility because it did not want other Kansas City area

Ford dealers to think Ford was trying to help Thoroughbred stay in business. Porter and Roger testified that Allen told them Ford would not buy them out and that the company thought Thoroughbred would have to "sink or swim."

On December 17, 1990, an article appeared in the *Kansas City Business Journal* discussing Ford's designation of Thoroughbred as a delete point and its plan to eliminate the dealership at the time of dealer change. The Porters testified that the article prompted a number of Thoroughbred customers, worried about what impact the elimination of the dealership would have on their warranty and service work, to call the dealership and inquire when it was going out of business. The Porters also testified that after the publication of the article customer traffic at Thoroughbred decreased dramatically and its new vehicle sales never returned to their pre–1990 levels. Allen testified in a deposition that the article, in his opinion, could have adversely affected Thoroughbred's new vehicle sales.

In 1992, Ford withdrew the delete letter it had issued to Thoroughbred. In 1993, Ford conducted another market survey of the Kansas City metropolitan area. The study recommended that Thoroughbred be relocated to I–29/Barry Road by the second quarter of 1995. At the time of trial in February 1994, Thoroughbred was making preparations to relocate to that area.

On April 11, 1991, plaintiffs filed a six-count petition against Ford, Ford Leasing, Heisler and Allen, which they amended on January 16, 1992, and again on November 18, 1993. Plaintiffs alleged that Ford had: (1) breached the covenant of good faith and fair dealing implied in the parties' FSSA; (2) violated the MVFPA in refusing to permit plaintiffs to relocate their dealership and in failing to disclose material information about Thoroughbred's market area; (3) fraudulently misrepresented that Thoroughbred would be able to relocate to the I–29/Barry Road site; and (4) fraudulently concealed material information about Thoroughbred's market area. Plaintiffs additionally claimed Ford and Ford Leasing breached the covenant of good faith and fair dealing implied in the

parties' lease agreement by conspiring to refuse to sell to plaintiffs the Thoroughbred dealership facilities in an attempt to drive plaintiffs out of business. Plaintiffs also alleged Ford Leasing violated the MVFPA in wrongfully refusing to sell to them the Thoroughbred dealership facilities and charging them excessive rent for occupying the facilities. On all counts, plaintiffs sought damages for the loss of profits and punitive damages.

Plaintiffs' evidence consisted of testimony from the Porters, the deposition testimony of Heisler and testimony from their expert, Lyman Ellis Ostlund, concerning plaintiffs' damages. In determining damages, Ostlund first testified about Thoroughbred's loss of profits due to Ford's designation of the dealership in 1990 as a delete point. Ostlund calculated that Thoroughbred's loss of profits from 1990 to 1993, adjusted to 1993 dollars, totaled $1,406,098.00.

Prior to plaintiffs' presentation of Ostlund's testimony, Ford filed a motion in limine, seeking to exclude Ostlund's testimony regarding alleged damages suffered by plaintiffs due to Ford's failure to relocate Thoroughbred to I–29/Barry Road. The trial court sustained Ford's objection to the admission of the testimony but permitted plaintiffs to make an offer of proof regarding this issue. In the offer of proof, Ostlund testified about an economic model he constructed of achievable profits for a dealership located at I–29/Barry Road versus the actual profits Thoroughbred earned from 1990 to 1993. He analyzed, for this time frame, the sales of all Kansas City Ford dealers relative to the planning volumes established by Ford for these same dealers and "struck a ratio as to how well their sales performance held up against that assigned planning volume." Using this ratio, Ostlund calculated the average percentages of planning volumes met by Kansas City Ford dealers for the relevant time period. Then, using the planning volume figure of 1500 units per year estimated by Ford in 1988 for a potential dealership located at I–29/Barry Road, Ostlund calculated how many units would have been sold at this location in the four-year time frame. From this figure, Ostlund subtracted the ac-

728

tual amount of units Thoroughbred sold and calculated that the resulting number of units lost by Thoroughbred due to its failure to relocate to I–29/Barry Road, adjusted to 1993 dollars, totaled $4,503,277.00.

At the conclusion of plaintiffs' evidence, the trial court, upon Ford's motion, granted directed verdicts in favor of defendants on all counts against Ford Leasing and all claims against Ford except for the portion of Count II in which plaintiffs alleged that Ford violated the MVFPA in preventing plaintiffs from selling the dealership. Ruling on Thoroughbred's motion for a mistrial due to the trial court's exclusion of evidence of relocation damages, the court maintained its previous ruling and restricted evidence on Count II damages to lost profits caused by the issuance of the delete letter. The trial court also dismissed the individual plaintiffs and Ford Leasing from the case.

Ford then presented the testimony of Bill Schaefer, the deposition testimony of Allen, the deposition testimony of Carl Mastropaolo, a market research analyst for Ford, and the expert testimony of Lawrence Morriss in which he refuted Ostlund's testimony concerning damages.

The jury returned a verdict in favor of Thoroughbred on the remaining count for $1,406,098.00. On Ford's motion, the trial court granted judgment notwithstanding the verdict, finding that: (1) as a matter of law Ford did not violate the MVFPA because "there was no evidence from which a jury could reasonably find that plaintiff desired, attempted or proposed to sell or transfer any interest in the subject dealership"; (2) "the damage testimony offered by plaintiff for lost sales of new vehicle units lacked foundation and was too speculative to support recovery for damage sustained as a direct result of the alleged unlawful conduct"; and (3) the verdict was against the weight of the evidence. This appeal followed.

I. Judgment Notwithstanding the Verdict

In their first point, plaintiffs contend the trial court erred in granting Ford's motion for judgment notwithstanding the verdict. Plaintiffs argue that the evidence submitted substantially supported the jury's finding that Ford violated § 407.825(7) of the MVFPA in preventing plaintiffs from selling Thoroughbred by designating the dealership to be a delete point. Plaintiffs further assert that the evidence was sufficient for the jury to find that Ford's action caused a decline in new vehicle sales at Thoroughbred, thereby damaging plaintiffs.

Granting a motion for JNOV is akin to directing a verdict at the close of all the evidence. *Jones v. Sherman*, 857 S.W.2d 468, 471[2] (Mo.App.E.D.1993). Thus, in determining whether a motion for JNOV was properly granted, we must view the evidence in the light most favorable to the verdict and disregard all of movant's evidence and inferences therefrom that are contrary to the verdict. *Desai v. SSM Health Care*, 865 S.W.2d 833, 836[2] (Mo.App.E.D.1993). We will affirm the entry of a JNOV only if upon reviewing the evidence we find that reasonable minds could not differ as to the proper verdict. *Venitz v. Creative Management, Inc.*, 854 S.W.2d 20, 21[3] (Mo.App.E.D.1993).

Section 407.825 of the MVFPA sets forth a cause of action for motor vehicle franchisees against franchisors who engage in unlawful practices as defined thereafter in the provision. Section 407.825(7) provides that it is unlawful for a franchisor:

**To prevent by contract or otherwise any motor vehicle franchisee or any officer, partner or stockholder of any motor vehicle franchisee from selling or transferring any part of the interest of any of them to any other person or persons or party or parties;** provided, if the franchise specifically permits the franchisor to approve or disapprove of any such proposed sale or transfer, a franchisor shall only be allowed to disapprove of a proposed sale or transfer if the interest being sold or transferred when added to any other interest owned by the transferee constitutes fifty percent or more of the ownership interest in the franchise and if the proposed transferee fails to satisfy any standards of the franchisor which are in fact normally relied upon by the franchisor prior to its entering into a franchise, and which relate to the proposed management or ownership of the

franchise operations or to the qualification, capitalization, integrity, or character of the proposed transferee and which are reasonable. (emphasis added)

Plaintiffs contend that Ford violated the highlighted portion of the statute, the enacting clause, in issuing Thoroughbred a delete letter which prevented plaintiffs from selling or transferring the dealership.

The issue presented by plaintiffs is one of first impression in Missouri as there is no Missouri case law construing this portion of the MVFPA. Furthermore, after conducting a review of a number of similar statutes enacted in other jurisdictions, we were only able to locate cases dealing with a franchisor's prohibition of a proposed sale of a franchise by a franchisee. *See, e.g., Simonds Chevrolet, Inc. v. General Motors Corp.,* 564 F.Supp. 151 (D.Mass.1983); *Key v. Chrysler Motors Corp.,* 119 N.M. 267, 889 P.2d 875 (1995); *Beard Motors v. Toyota Motor Distributors,* 395 Mass. 428, 480 N.E.2d 303 (1985). Our research yielded no cases in which a franchisor, subsequent to the execution of a franchise agreement, issued to a franchisee a delete letter effecting a prohibition on selling or transferring a franchise.

■ In construing a statute, our primary responsibility is to ascertain the intent of the legislature from the language used and give effect to that intent. In doing so, we first give the words used their plain and ordinary meaning, and we construe together provisions of the entire legislative act, trying to harmonize all of the provisions, if reasonably possible. *Hagely v. Board of Educ.,* 841 S.W.2d 663, 667[2–3] (Mo. banc 1992); *Lindsay v. Hopkins,* 788 S.W.2d 776, 779[8–9] (Mo.App.1990). Moreover, "resort should be had to all parts of an act in order to arrive at the true meaning of any of the provisions thereof." *Morgan v. Jewell Const. Co.,* 230 Mo.App. 425, 91 S.W.2d 638, 640[1] (1936).

■ The portion of a statute beginning with "provided" is a proviso, which is generally confined to the clause or distinct portion of the statute which immediately precedes it or to which it pertains. *Commerce Bank v. Mo. Div. of Finance,* 762 S.W.2d 431, 434[1] (Mo.App.1988). The function of a proviso is

"to create a condition precedent; to except something from the enacting clause; to limit, restrict, or qualify the statute in whole or in part; or to exclude from the scope of the statute that which otherwise would be within its terms." *Id.* (citing 73 Am.Jur.2d *Statutes* § 318 (1974)). A proviso does not enlarge or separately confer power or independent legislation. *Id.*

■ Applying these principles, we conclude that plaintiffs' evidence does not support a cause of action under § 407.825(7). In granting Ford's motion for judgment notwithstanding the verdict, the trial court found that "there was no evidence from which a jury could reasonably find that plaintiff desired, attempted or proposed to sell or transfer any interest in the subject dealership." Our review of the record indicates the same.

Plaintiffs offered no evidence that they attempted to sell Thoroughbred or locate a prospective purchaser or that they even desired to sell the dealership. Plaintiffs, therefore, essentially claim that Ford, in issuing the delete letter to Thoroughbred, would have unreasonably withheld its consent to a proposed sale by plaintiffs at some time in the future. However, § 407.825(7), viewed in its totality, does not provide relief for such anticipatory conduct.

The statute as a whole prohibits a franchisor from preventing a proposed sale or transfer of a franchise by a franchisee. The proviso begins, "provided, if the franchise specifically permits the franchisor to approve or disapprove any *such proposed sale or transfer.* . . ." (emphasis added) In this construction, "such" qualifies "proposed sale or transfer"; it is a descriptive and relative word, referring to the last antecedent—the reference in the enacting clause to "selling or transferring." *See Rothschild v. State Tax Com'n of Mo.,* 762 S.W.2d 35, 37[2] (Mo.banc 1988); *Beatty v. Metropolitan St. Louis Sewer Dist.,* 731 S.W.2d 318, 320[3] (Mo.App. 1987). Thus, the statute prohibits a franchisor's prevention of a proposed sale or transfer of a franchise.

The evidence indicates that plaintiffs failed to make a submissible case on this claim.

There is no evidence that they made any attempt to sell the Thoroughbred dealership. Actually, the evidence shows that plaintiffs spent a considerable amount of time and effort to relocate Thoroughbred to the I–29/Barry Road area. Such actions are obviously inconsistent with any intent or desire to sell the dealership.

Since plaintiffs failed to prove that Ford engaged in an unlawful practice, we need not address whether plaintiffs sufficiently proved that they suffered damages under this claim. Point denied.

## II. Directed Verdicts

■ In plaintiffs' second through sixth points, they challenge the trial court's grant of directed verdicts in favor of defendants. In reviewing the grant of a directed verdict in favor of the defendant, we view the evidence most favorable to the plaintiff and disregard the defendant's evidence, except insofar as it supports the plaintiff's case, to determine whether the plaintiff made a submissible case. *Heacox v. Robbins Educational Tours,* 829 S.W.2d 600, 601[1] (Mo. App.1992); *Highway and Transp. Com'n v. Keeley,* 780 S.W.2d 84, 87[1] (Mo.App.1989). The evidence must establish every element of the plaintiff's case and not leave any issue to speculation. *Southwestern Bell Telephone Co. v. Buie,* 758 S.W.2d 157, 164[12] (Mo.App. 1988).

### A. MVFPA Violation

Plaintiffs claim the trial court erred in granting Ford's motion for a directed verdict on the remainder of plaintiffs' Count II in which they alleged that Ford violated § 407.825(1) of the MVFPA. This section of the MVFPA provides that it is unlawful for a motor vehicle franchisor, whether by act or omission, "[t]o engage in any conduct which is capricious, in bad faith, or unconscionable and which causes damage to a motor vehicle franchise or to the public...." In Count II of their petition, plaintiffs alleged that Ford violated this provision by failing to relocate Thoroughbred, failing to disclose to Porter prior to his purchase of Thoroughbred that the dealership was located in a "monitored area of growth," and failing to disclose to

plaintiffs that it might eliminate the Thoroughbred dealership following the release of its 1987 market study report.

■ The MVFPA does not define the terms "capricious, in bad faith, or unconscionable," and there is no Missouri case law interpreting § 407.825(1). Nevertheless, both the terms "capricious" and "unconscionable" have generally accepted meanings: "capricious" has been defined as "impulsive; unpredictable" and "unconscionable" has been defined as "shockingly unfair or unjust." Merriam Webster's Collegiate Dictionary 169, 1286 (10th ed. 1995); *see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 63[6–7] (1st Cir.1992) (interpreting similar provision in Maine statute). Furthermore, although the MVFPA does not define "bad faith," the Sales Article of the Missouri Uniform Commercial Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." § 400.1–201(19) RSMo.1994.

■ Plaintiffs first contend Ford acted arbitrarily, capriciously and in bad faith in withdrawing its approval of Thoroughbred's relocation to I–29/Barry Road following a complaint it received from another Ford dealer in the Kansas City area and in refusing to permit plaintiffs to relocate to that area following its issuance of a delete letter to Thoroughbred in June 1990. However, there is no evidentiary support for plaintiffs' contention. Ford told the Porters in late 1988 that based upon another dealer's complaint they could no longer tell people they were relocating to the I–29/Barry Road area. The evidence indicates that by this time Ford had investigated a relocation site for Thoroughbred, but there is no evidence that Ford approved the relocation of Thoroughbred to a particular site by executing a new Dealership Facilities Supplement as required under the FSSA. Therefore, Ford's statement does not constitute a withdrawal of approval to relocate. Moreover, there is no evidence that Ford acted impulsively or in bad faith in refusing to permit Thoroughbred to relocate to the I–29/Barry Road area following its issuance of the delete letter in 1990. Ford's action was based upon the 1989 market study report, which indicated that the I–29/Barry

Road area could not sustain a Ford dealership. Additionally, plaintiffs failed to prove that they sustained damages due to Ford's refusal to relocate Thoroughbred. This issue will be more fully addressed in Section III, *infra.*

■ Secondly, plaintiffs assert that Ford acted arbitrarily, capriciously and in bad faith in failing to disclose to Porter prior to his purchase of Thoroughbred that the dealership was in a "monitored area of decline." Plaintiffs contend Ford also violated § 407.825(1) in failing to inform them, following the release of its 1987 market study which again indicated that Thoroughbred was in a "monitored area of decline," that a dealership under such a designation could be eliminated by Ford in its discretion.

We agree with plaintiffs that the economic status of the dealership and the implications of its status constituted essential information which Ford clearly should have disclosed to plaintiffs. However, § 407.825 requires that a franchisee not only prove the franchisor engaged in an unlawful practice but also that the practice directly damaged the franchisee. Plaintiffs failed to offer any evidence proving that Ford's failure to disclose this information directly damaged them in any way. Plaintiffs offered evidence of lost profits due to Ford's issuance of the delete letter, and they made an offer of proof regarding profits lost due to Ford's failure to relocate Thoroughbred. However, there is no evidence of damages caused by Ford's failure to inform plaintiffs that Thoroughbred was in a "monitored area of decline." Plaintiffs thus failed to make a submissible case on this claim. *See Scott v. Car City Motor Co., Inc.,* 847 S.W.2d 861, 864[3] (Mo.App.W.D.1992). Point denied.

### B. Fraudulent Misrepresentation

In plaintiffs' third point, they contend the trial court erred in granting Ford a directed verdict on their claim that Ford committed fraudulent misrepresentation. Plaintiffs contend that Ford induced Porter to purchase the dealership by falsely representing that the dealership was designated for relocation, Porter was unaware of the falsity of the

representation and reasonably relied on it, and plaintiffs were thereby damaged.

■ The elements of a claim of fraudulent misrepresentation are: (1) a false, material representation; (2) the speaker's knowledge of its falsity or his ignorance of the truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the representation; (5) the hearer's reliance on its truth; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury. *Dierker Associates v. Gillis,* 859 S.W.2d 737, 746–47[22] (Mo.App.E.D.1993). A failure to establish any one of these elements with substantial evidence is fatal to recovery. *Scott,* 847 S.W.2d at 864.

The primary representation at issue here is Heisler's statement to Porter, prior to Porter's purchase of Thoroughbred and the execution of the FSSA, that the dealership would be relocated to I–29/Barry Road. Plaintiffs additionally contend that Allen repeated this representation following the release of Ford's 1987 market study report for the Kansas City area.

■ There is no evidence that these representations were false. The truth or falsity of a representation is determined at the time it was made and at the time it was intended to be relied on. *Frame v. Boatmen's Bank,* 782 S.W.2d 117, 120[5] (Mo.App. 1989). Plaintiffs contend that Heisler's representation was false because Ford did not designate I–29/Barry Road as a "future preferred location" for a dealership until it released the 1987 market study report. There is no evidence, however, that such a designation of a site is required before Ford will permit a dealer to consider relocating or to actually relocate to that site. Moreover, Porter testified that Heisler did not state a specific date for the relocation of Thoroughbred. The 1987 market study report, therefore, when viewed in conjunction with Allen's subsequent representation, reaffirms that Heisler's representation was true when he made it. Also, following Allen's representation, a number of Ford representatives assisted the Porters in trying to find a sufficient relocation site in the I–29/Barry Road

area, indicating that Allen's representation when made was also true.

We must further point out that both representations amounted to a promise by Ford that Thoroughbred would sometime in the future be permitted to relocate to the I-29/Barry Road area. It is well-settled that an unkept promise does not constitute actionable fraud unless it is accompanied by a present intent not to perform, in which case it constitutes a misrepresentation of a present state of mind—itself an existent fact. *In re Marriage of Pfeifer*, 862 S.W.2d 926, 930[4] (Mo.App.S.D.1993); *Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 539[18] (Mo.App.1986); *Kiechle v. Drago*, 694 S.W.2d 292, 294[3] (Mo.App.1985). Furthermore, "the intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance...." *Drago*, 694 S.W.2d at 294. Our analysis concerning the actions of Ford following the representations, in which it assisted the Porters in locating a relocation site, indicate that there was no present intent to not perform its promises to relocate Thoroughbred to I-29/Barry Road.

Therefore, plaintiffs' failure to prove this element of its fraud claim alone supports the trial court's grant of a directed verdict in Ford's favor. Additionally, plaintiffs failed to prove that they sustained any damages due to the alleged misrepresentations. This issue, however, will be fully addressed in Section III *infra*. Point denied.

### C. Fraudulent Concealment

In their next point, plaintiffs allege the trial court erred in granting a directed verdict in favor of Ford on their claim that the company fraudulently concealed material information which it had a duty to disclose. Specifically, plaintiffs argue that Ford failed to inform Porter prior to his purchase of Thoroughbred that the dealership was located in a "monitored area of decline" and later, after he learned of the designation, failed to explain to him the implications of the designation.

Silence can constitute misrepresentation if the complaining party operates under some misconception which the other party is under some duty to disclose and correct. *McCoy v. Spelman Memorial Hosp.*, 845 S.W.2d 727, 731[11] (Mo.App.W.D. 1993). Such a duty to disclose is imposed where a fiduciary relationship exists between the parties or where one party expressly or by clear implication places a special confidence in the other. *Blaine v. J.E. Jones Const. Co.*, 841 S.W.2d 703, 705[2] (Mo.App. E.D.1992). The latter situation is often characterized as a relationship where one of the parties has superior knowledge which is not within the fair and reasonable reach of the other. *Id.*

Plaintiffs contend that Ford knew that Thoroughbred, at the time of Porter's purchase, was located in a "monitored area of decline" but concealed this information, which was not within the fair and reasonable reach of Porter. Plaintiffs further contend that Ford did not inform him or his brother of this designation until 1987 and then waited two additional years before explaining to them that the designation meant that Ford could, at its discretion, eliminate the dealership. Moreover, plaintiffs contend Porter would not have purchased Thoroughbred if he had known of the designation and its effect.

Even if we accept as true plaintiffs' claim that Ford had a duty to disclose the designation and its effect prior to Porter's purchase and the execution of the FSSA, plaintiffs still failed to make a submissible case of fraudulent concealment. In a case involving the passive nondisclosure of material information, "one party has an affirmative duty to disclose information, and that party's failure to disclose the information serves as a substitute for the false representation element required in fraud." *Blaine*, 841 S.W.2d at 705[2]. Plaintiffs still had the burden of proving every other element of fraud set forth in Subsection B *supra*. The record clearly indicates, however, that plaintiffs failed to offer any evidence indicating that the alleged fraudulent concealment of information directly damaged them in any way. Plaintiffs' offered expert testimony concern-

ing their loss of profits due to Ford's issuance of the delete letter in 1990, and they made an offer of proof regarding profits lost due to Ford's failure to relocate Thoroughbred. However, there is no evidence in the record of any damages caused by Ford's fraudulent concealment. This is fatal to plaintiffs' claim. *Scott*, 847 S.W.2d at 864. Point denied.

### D. Covenant of Good Faith and Fair Dealing

In their fifth point, plaintiffs contend the trial court erred in granting a directed verdict in favor of Ford on their claim that Ford breached the covenant of good faith and fair dealing implied in the FSSA. Essentially, plaintiffs reiterate their arguments set forth in Subsection A *supra*, alleging that Ford acted unfairly and in bad faith in misrepresenting that Thoroughbred would be permitted to relocate.

■ Michigan common law, which controls under the FSSA, recognizes an implied covenant of good faith and fair dealing that applies to the performance and enforcement of all contracts. *Hubbard Chevrolet Co. v. General Motors Corp.*, 873 F.2d 873, 877 (5th Cir.1989); *ParaData Computer Networks, Inc., v. Telebit Corp.*, 830 F.Supp. 1001, 1005[6] (E.D.Mich.1993). Michigan courts only imply the covenant where a party to a contract makes the manner of its performance a matter of its own discretion. *Hubbard*, 873 F.2d at 877; *Burkhardt v. City National Bank of Detroit*, 57 Mich.App. 649, 226 N.W.2d 678, 680[1] (1975). However, where parties have unmistakably expressed their respective rights, Michigan law does not imply the covenant. "The implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them." *Hubbard*, 873 F.2d at 877 (quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 485 (5th Cir.1984)).

*Hubbard* is helpful in defining the scope of the implied covenant of good faith and fair dealing. The case reviewed the challenge of Hubbard, an automotive dealer, to a verdict in favor of General Motors (GM) on his claim

that GM breached the covenant of good faith and fair dealing implied in the parties' franchise agreement in refusing to permit him to relocate. The parties' dealership agreement and dealership location addendum provided that Hubbard was to operate only from the location approved by GM and that Hubbard and GM could reach an agreement to relocate, but any such change had to be reflected in a new dealership location addendum. Hubbard and GM never executed a new location addendum. *Hubbard*, 873 F.2d at 874–75, 877. The court concluded that: "the covenant [of good faith and fair dealing] had no role to play in the relocation dispute between GM and Hubbard.... The contract does not limit the reasons upon which GM can base its relocation decisions.... [Hubbard] gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties." *Id.* at 878.

■ We are persuaded by the *Hubbard* decision in concluding that the covenant of good faith and fair dealing is not applicable to the relocation dispute between Thoroughbred and Ford. As an addendum to the FSSA, Thoroughbred and Ford executed a Dealership Facilities Supplement, which provided that Thoroughbred was to operate at the intersection of Independence and Paseo and that "[c]hanges in DEALERSHIP FACILITIES, LOCATIONS and their usage ... will be reflected in a new Dealership Facilities Supplement when deemed necessary by the Company [Ford] and agreed upon by the Dealer [Thoroughbred]." The FSSA stated that the parties had executed a Dealership Facilities Supplement which included a description of the dealership location. The FSSA further provided that the dealer "shall not move or substantially modify or change the usage of any of the DEALERSHIP LOCATION or FACILITIES ... without the prior written consent of the Company" and that any such change must be evidenced by a new Dealership Facilities Supplement. Plaintiffs offered no evidence indicating that a new Dealership Facilities Supplement had been executed permitting Thoroughbred to operate at I–29/Barry Road.

As in *Hubbard,* the parties' contract specifies Thoroughbred's location and flatly prohibits relocation absent Ford's approval. Porter gave Ford the discretion to approve or disapprove any proposed relocation for its own reasons, defining the limits of what the contract required of the parties. We refuse to imply a covenant of good faith and fair dealing to override or contradict such express terms of the contract. Point denied.

### E. MVFPA and Covenant of Good Faith and Fair Dealing

In plaintiffs' next point, they argue the trial court erred in granting directed verdicts in favor of Ford and Ford Leasing on Count V and in favor of Ford Leasing on Count VI of their amended petition.

Plaintiffs claim they presented sufficient evidence on Count V in which they alleged Ford and Ford Leasing violated the MVFPA in conspiring to drive Thoroughbred out of business by refusing to sell the dealership facilities to Thoroughbred. As a preliminary matter, we must first point out that the MVFPA only applies to motor vehicle franchise relationships. Ford Leasing was not a party to the FSSA—the franchise agreement—and was only a landlord to plaintiffs. The MVFPA does not apply to Ford Leasing. We therefore must review only whether Ford violated the MVFPA in refusing to permit Thoroughbred to purchase the dealership facilities.

Plaintiffs contend that Ford, in bad faith, refused to permit Thoroughbred to purchase the dealership facilities to drive the dealership out of business in violation of § 407.825(1) of the MVFPA, which prohibits a franchisor from engaging in any conduct in bad faith that causes damage to a motor vehicle franchisee. To support this allegation, plaintiffs cite their evidence that Ford refused to permit such a transaction because it did not want other Ford dealers in the Kansas City area to think it was helping Thoroughbred stay in business and that the company's position was that Thoroughbred would have to "sink or swim" at its location.

The MVFPA clearly provides that a franchisee must not only prove under § 407.825(1) that the franchisor engaged in bad faith conduct but also that the conduct caused damage to the franchisee. Regardless of whether Ford acted in bad faith in refusing to permit Thoroughbred to purchase the dealership facilities, plaintiffs failed to offer any proof that they suffered any resulting damages. Porter testified that the purchase of the facilities would have reduced Thoroughbred's operating expenses. There is no evidence in the record, however, supporting this contention.

In Count VI of their amended petition, plaintiffs alleged that Ford Leasing violated the covenant of good faith and fair dealing implied in the parties' lease by refusing to permit plaintiffs to purchase the Thoroughbred dealership facilities. Again, plaintiffs rely on a number of Michigan cases in which an implied covenant of good faith and fair dealing is recognized to apply to the enforcement and performance of contracts.

■ Unlike the FSSA, there is no choice of law provision in the lease. The record does not indicate where the lease was negotiated. However, several contractual contacts indicate that Missouri is the applicable law for interpreting the lease: Thoroughbred is a Missouri corporation with its place of business in Missouri; the lease agreement was for real property located in Missouri; the lease was executed in Missouri; and performance was to occur in Missouri. *National Advertising Co. v. Herold,* 735 S.W.2d 74, 77[1] (Mo.App.1987); *see also* Restatement (Second) of Conflicts of Law § 188 (1971). Therefore, the interpretation of the lease agreement and the rights and duties of the parties under the agreement are governed by the laws of Missouri.

■ Like Michigan, Missouri law implies a covenant of good faith and fair dealing in every contract. *Morton v. Hearst Corp.,* 779 S.W.2d 268, 273[12] (Mo.App.1989). There is no evidence, however, that Ford Leasing violated this covenant. The evidence clearly indicates that Ford Leasing initially approved Thoroughbred's proposed purchase of the dealership facilities and that Ford, not Ford Leasing, placed the facilities on the "not for sale" list. Furthermore, as we already noted, there is no evidence in the

record showing that plaintiffs were damaged due to their inability to purchase the facilities. Point denied.

### III. Exclusion of Relocation Damages

■ Plaintiffs also contend the trial court erred in excluding testimony from their expert concerning damages they suffered due to Ford's failure to relocate Thoroughbred to I–29/Barry Road. The trial court has wide discretion in determining whether to admit evidence, but it is error to exclude competent evidence on a material issue of fact. *Deveney v. Smith,* 812 S.W.2d 810, 812[2] (Mo. App.1991).

■ Plaintiffs allege that Ford's fraudulent misrepresentations induced them into purchasing Thoroughbred, executing the FSSA and continuing to operate the dealership. In such a case of fraud, where the defrauded party elects to retain the business, Missouri courts are committed to the benefit of the bargain rule as a method of arriving at damages. *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443[2] (Mo.banc 1988); *Chambers v. McNair,* 692 S.W.2d 320, 325[6] (Mo. App.1985). Under the rule, a defrauded party is to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented. *Id.* This rule encompasses the loss of anticipated or future profits. *See Jacobs Manufacturing Co. v. Sam Brown Co.,* 19 F.3d 1259, 1264[7] (8th Cir.1994). On this basis alone, plaintiffs contend that their expert should have been permitted to testify to the profits Thoroughbred lost due to Ford's failure to relocate the dealership. There are, however, fundamental hurdles which plaintiffs failed to clear in order to permit the admission of such evidence.

■ For a false representation to be actionable, a causal connection must exist between the misrepresentation and the harm allegedly sustained. *Heberer,* 744 S.W.2d at 443. The damages must flow from the fraud as the proximate and not the remote cause, and the damages must be the natural and probable consequence of the fraud. *Id.* at 443–44; *McKall v. Jim Lynch Cadillac, Inc.,* 791 S.W.2d 456, 458[7] (Mo.App.1990).

■ Missouri courts have been strict in their review of the sufficiency of the evidence warranting recovery for loss of profits because a number of factors can enter into the composition of such damages. Our courts have stressed that lost profits are only recoverable "when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits." *Brown v. McIBS, Inc.,* 722 S.W.2d 337, 341 (Mo.App.1986); *see also Oster v. Kribs Ford, Inc.,* 660 S.W.2d 348, 353[3] (Mo.App.1983). Recovery is prohibited "when there is uncertainty or speculation as to whether the loss of profits was the result of the wrong, and whether any such profits would have derived at all." *Southern Missouri Bank v. Fogle,* 738 S.W.2d 153, 158[10] (Mo.App.1987). In a case such as the one at bar involving an established business, anticipated profits may be recoverable where the plaintiff makes it reasonably clear by competent proof what they would have been. *Brown,* 722 S.W.2d at 341. "It is indispensable that this proof include the income and expenses of the business for a reasonable anterior period, with a consequent establishing of the net profits during the previous period." *Id.*

■ In applying the foregoing principles, we conclude that plaintiffs failed in their offer of proof to demonstrate with certainty that Ford's alleged misrepresentations caused plaintiffs to lose anticipated profits at the I–29/Barry Road location. The most critical insufficiency in plaintiffs' offer concerns the hypothetical dealership at I–29/Barry Road. In plaintiffs' offer of proof, there was evidence of Thoroughbred's income and expenses for a reasonable period anterior to the 1990 delete letter and for the period following 1990. However, there was no such data concerning an anterior period for the hypothetical dealership at I–29/Barry Road. Ostlund instead determined the profits a dealership would have earned at that location by relying on the average performance of all dealerships in the Kansas City area. This data, however, does not provide a rational estimate of profits for a non-existent dealership at the I–29/Barry Road area. There was no evidence indicating that the average performance of all Kansas City Ford

dealers serves as a reliable indicator of how any particular dealership would perform. Because a Ford dealership never existed at I–29/Barry Road, there is no rational way to estimate anticipated, future profits at such a location. Ostlund's determination was therefore speculative.

Moreover, Ostlund's estimate of lost profits covered the period from 1990 through 1994. But according to Porter's testimony, Thoroughbred was ready and willing to relocate by the fall of 1988. It may be possible that Thoroughbred lost profits by not being relocated to I–29/Barry Road from this time until the release of the 1989 market study in June 1990. However, the study revealed that the I–29/Barry Road area could not adequately support a Ford dealership, prompting Ford to withdraw its designation of the area as a "future preferred location" for a Ford dealership. Ostlund never accounted for the effect of this designation on any profits anticipated from the hypothetical location following June 1990 nor did he address the apparent change in market conditions in the I–29/Barry Road area which would certainly affect any attempt to start a new business there.

Plaintiffs failed to prove with reasonable certainty that any damage occurred due to Ford's alleged misrepresentations that it would relocate Thoroughbred. Point denied.

## IV. Evidentiary Rulings

In their final point, plaintiffs contend the trial court erred in excluding a number of items of evidence that were relevant and material to disputed issues. As we have already noted, the trial court's ruling on the admissibility of evidence is accorded substantial deference and will not be disturbed absent an abuse of discretion. *Brown v. Hamid*, 856 S.W.2d 51, 56[12] (Mo.banc 1993). Furthermore, relevant and material evidence may not be excluded solely because it tends to prejudice the jury against a party. *Brown*, 856 S.W.2d at 56[10]. Evidence is relevant if it tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Id.* [11].

## A. Newspaper Articles

Plaintiffs contend the trial court erred in excluding from evidence an article written in the December 17, 1990, issue of the *Kansas City Business Journal*, concerning Ford's designation of Thoroughbred as a delete point. Following Ford's motion in limine, the trial court sustained the motion and excluded the evidence, finding that it was hearsay, irrelevant and unfairly prejudicial to Ford. Plaintiffs argue that the article was relevant and material in establishing a causal connection between Ford's issuance of the delete letter and Thoroughbred's resulting decline in profits. Plaintiffs further contend the article was not inadmissible hearsay because it was not offered to prove the truth of the matter asserted and the court could have alleviated any potential hearsay problem with a limiting instruction.

We agree with plaintiffs that the trial court erred in ruling that the article could not be admitted because it was hearsay. Plaintiffs clearly indicated to the trial court that they were offering the article simply to prove that it was in fact written, not to prove the truth of the matters asserted therein. If the significance of an offered writing lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the offered utterance or writing is not hearsay. *Mattes v. Black & Veatch*, 828 S.W.2d 903, 908[8] (Mo.App.1992).

However, plaintiffs failed to prove they were prejudiced by the trial court's abuse of its discretion. An error in the exclusion of evidence is harmless if the same facts have been shown by other evidence. *King v. Copp Trucking, Inc.*, 853 S.W.2d 304, 307[3] (Mo.App.W.D.1993). Although the trial court excluded the article from evidence, it permitted the plaintiffs' to show the article from a distance and ask witnesses about the existence of the article without delving into its contents. Plaintiffs, therefore, were permitted to present to the jury the facts they desired regarding the article.

## B. Deposition Testimony of Joseph Parrelly

Plaintiffs next claim the trial court erred in excluding portions of the deposition testimo-

ny of Joseph Parrelly, a Ford market study analyst. In the excluded testimony, Parrelly stated that Ford had rescinded the delete letter it issued to Thoroughbred, that Ford's legal department "issued us an edict, as it were, that we were to no longer use 'delete at time of dealer change' for any plan for any dealer in the whole country," and that in the past Ford "almost always" simply designated a dealer for relocation when the dealer was located in an area that should have been designated a delete point. Plaintiffs contend the testimony constituted admissions against interest by Ford and should have been admitted to show Ford's bad faith conduct in violation of the MVFPA and in violation of the covenant of good faith and fair dealing implied in the parties' FSSA.

An admission is a party's conscious, voluntary acknowledgment of certain facts which are relevant to the litigation and inconsistent with its contentions in the action. *Spearman v. Hoskins,* 806 S.W.2d 440, 441[2] (Mo.App.1991). Furthermore, admissions against interest made by an employee are admissible against the employer if they are made in the scope of the employee's duties and the employee has some executive capacity. *Kansas City v. Keene Corp.,* 855 S.W.2d 360, 367[5] (Mo.banc 1993).

The admission that Ford almost never deletes dealerships does not conflict with Ford's position at trial. William Schaefer, who testified on Ford's behalf, admitted that such a designation of a dealership is rare. In the second admission, Parrelly could only testify that Ford changed its policy regarding the use of the delete point designation. He did not explain why the policy was changed. The testimony, therefore, was clearly irrelevant and immaterial to the purpose for which it was offered—to show that Ford knew that its previous use of the designation was improper.

## C. Deposition Testimony of David Rittman

Plaintiffs further allege the trial court erred in excluding the deposition testimony of David Rittman, the former regional operations manager for Ford's central region which included Kansas City. In the excluded testimony, Rittman stated that in a conversation he had in 1984 with Bernie Sauer, who was the assistant district manager for Ford's Kansas City district, Sauer said that if Porter did a good job with Thoroughbred it would be a prime candidate for relocation to I–29/Barry Road. Plaintiffs contend this testimony constitutes an admission against interest by Ford, showing its knowledge that it had promised Porter it would relocate Thoroughbred.

First, the statement does not show Ford's knowledge that it promised Porter anything. According to Rittman, Sauer simply said that if Porter performed well he would be a *candidate* for relocation. Moreover, plaintiffs presented testimony from both Porter and his brother that Ford had promised to relocate Thoroughbred. Clearly, Rittman's testimony was cumulative evidence, which is defined as "additional evidence of the same kind bearing upon the same point." *Mobley v. Webster Elec. Cooperative,* 859 S.W.2d 923, 933[18] (Mo.App.S.D.1993). It is generally proper to exclude cumulative evidence. *Destin v. Sears, Roebuck and Co.,* 803 S.W.2d 113, 116[8] (Mo.App.1990).

## D. Ford Memoranda

Plaintiffs next claim the trial court erred in excluding memoranda prepared by Schaefer while he was the sales manager of Ford's Kansas City district. One memorandum was actually admitted into evidence during plaintiffs' direct examination of Porter. The other memorandum concerned Ford's placing the Thoroughbred dealership facility on the "not for sale" list, an issue that related to plaintiffs' fifth and sixth counts. Plaintiffs offered the memorandum during their cross-examination of Schaefer. At this time, the trial court had already directed verdicts in favor of Ford and Ford Leasing on plaintiffs' fifth and sixth counts. The evidence, therefore, did not relate to the only remaining issue before the jury—Ford's alleged violation of the MVFPA in prohibiting plaintiffs from selling or moving Thoroughbred. As such, the trial court properly excluded the evidence as collateral and thus irrelevant.

## E. Ford Reports

Plaintiffs also contend the trial court erred in excluding Ford's 1993 third-quarter

738

stock report to stockholders and its 1992 annual report. In an offer of proof, the plaintiffs contended the evidence was relevant to proving punitive damages. The trial court rejected plaintiffs' argument, finding that the exhibits were irrelevant because it had already directed verdicts on all counts which gave rise to punitive damages.

Plaintiffs made allegations of the independent, willful torts of fraudulent representation and fraudulent concealment, which gave rise to punitive damages. However, they offered insufficient proof on these allegations. At the time of plaintiffs' proffer of the reports, the only issue remaining regarded Ford's alleged violation of the MVFPA in prohibiting plaintiffs from transferring Thoroughbred, an issue upon which plaintiffs were not entitled to recover punitive damages pursuant to the MVFPA. *See Tom Pappas Toyota, Inc. v. Toyota Motor Distributors, Inc.,* 729 F.Supp. 71, 71–72[1] (E.D.Mo.1990).

F. Model for Relocation Damages

Finally, plaintiffs claim the trial court erred in excluding an exhibit showing Ostlund's economic model for determining Thoroughbred's loss of profits due to Ford's failure to relocate the dealership to I–29/Barry Road. We have already addressed the lack of error in the trial court's exclusion of plaintiffs' evidence concerning relocation damages in Section III *supra.* For the same reasons set forth in that section, we find no error in the exclusion of this exhibit. Point denied.

Judgment affirmed.

AHRENS and KAROHL, JJ., concur.